**Jordan K. Cameron (12051)**
*jcameron@djplaw.com*
**DURHAM JONES & PINEGAR, P.C.**
3301 N Thanksgiving Way, Suite 400
Lehi, Utah 84043
Telephone: (801) 375-6600
Fax: (801) 375-3865

**Attorney for Plaintiff XMission, L.C.**

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| XMISSION, L.C., a Utah company,<br><br>        Plaintiff,<br><br>vs.<br><br>9 FOUR ONE MEDIA, a Florida company;<br>ABOVE ALL OFFERS CORPORATION, an<br>Oregon corporation; THE AFFILIATI<br>NETWORK, Inc., a Florida corporation;<br>AGORA FINANCIAL, LLC, a Maryland<br>limited liability company; FLUENT, LLC a<br>New York limited liability company; DOES 1-<br>10,<br><br>        Defendants. | **OPPOSITION TO MOTION TO<br>DISMISS [ECF 22]**<br><br>[REDACTED]<br><br><br>Case No.: 2:18cv00182<br><br>Judge Robert J. Shelby |

COMES NOW Plaintiff XMission, L.C. ("XMission"), and submits this *Memorandum in Opposition to Motion to Dismiss* [ECF 22] filed by Fluent, LLC together with the *Declaration of Peter L. Ashdown* and Exhibits[1].

---

[1] For convenience of the Court, the *Declaration of Peter L. Ashdown* and all Exhibits are marked in consecutive numeric order beginning with P0001. Citations to the Declaration and exhibits simply refer to the number designation.

1

## Introduction and Statement of Requested Relief

At its heart, this case is about Fluent's fraudulent collection, or attempted fraudulent collection, of personal information from Utah citizens. The first step in the process, set in motion by Fluent, was the transmission of over 10,000 false and misleading emails through XMission's email servers in Utah, and directed at Utah citizens.  The emails purport to come from a wide range of recognized companies such as Chick-Fil-A, Chipotle, Amazon and Starbucks[2], to name a few (*see* P0013-30), and purport to offer free rewards. For example:

| Subject: | Enjoy Any-Delicious Sandwich: On-Us! For - ██████████ |
|----------|-------------------------------------------------------|
| From:    | Chick-Fil-A                                           |
| To:      | ████████████████                                      |
| Date:    | Thu, 21 Jul 2016 14:11:14 -0700                       |

P0025.  The "from" name of this email (and over 500 others like it) claims the email is from Chick-Fil-A. The "subject" heading claims to offer a sandwich "On-Us." Once opened, the emails contain an alleged product offer:

> Chick-filA
> Join us at ANY Chick-filA location for a delicious-meal
>
> Come & Eat With Four (4) People

*Id*.  The emails are a sham, and embedded in the offers are links that connect the email recipients with one of Fluent's websites. In this particular example, the link is as follows:

```
http://███████████████████████/?Flow=6b51d955-0748-
462e-9eb5-
```

---

[2] It is worth noting that the companies whose identities are used in the "From" lines of the Fluent emails all have a very strong Utah presence.

2

0ccdd7eceb37&isPrePop=true&reward=chk100&subaff1=65&subaff2=199304&subaff3=41771&subaff4=Chi

P0132. Restauarantpromotionsusa.com continues to perpetuate the fraud by presenting yet another offer, and requesting that the unsuspecting consumer respond to a seemingly innocuous question, "Do you eat at Chili's?"



Once the consumer click "yes" or "no," they are routed through a series of additional questions, and along the way, Fluent gathers sensitive personal information. *See* P0075-86.

3

Before the consumer is likely aware that it is being led down the path of a pay-to-play "reward" program and presented with *Terms & Conditions*, he or she has already provided their approximate age, email address, full name, zip code, street address and phone number. *See id.*



In this case, Fluent continuously and systematically since 2015, attempted to induce over 1,100 Utah citizens through over 10,000 emails sent into Utah through XMission's servers, to click Fluent's links and provide personal information to Fluent through Fluent's websites.

To complete its objective which is clearly outlined on its website, Fluent uses a sophisticated technical web, which relies at the first step on the unlawful dissemination of thousands of spam email through XMission's server network in Utah which are linked to many websites ostensibly controlled by Fluent's wholly owned subsidiaries. Fluent is inextricably involved at every step of contact with the XMission customers in Utah, beginning with providing the content for the unlawful emails (*see* ECF 23 at ¶4), providing the mechanism to gather the personal information from the XMission customers in Utah (*see infra* websites), gathering the personal information from XMission's customers in Utah, and selling the information. *See* http://fluentco.com. The law does not permit Fluent to avoid litigation in Utah simply because it places the responsibility for actually clicking send on its unlawful emails in the hands of third parties.

4

Companies such as Fluent profit from continuous and repeated abuses of Federal marketing laws by targeting massive email campaigns at small Internet access services with insufficient resources to defend against such abuses. As with Fluent here, such companies establish extensive networks of subsidiary companies and marketing agents in efforts to distance themselves from the violations of the law, but in the end, the stream of commerce which resulted in harm to XMission in Utah was set in motion by Fluent. It is often said that money makes the world go round. In this case, Fluent, who controls the money, makes this world go round and cannot avoid litigation in Utah by invoking a fictitious lack of contact with the forum state.

The CAN-SPAM Act imposes liability on companies who act as Fluent has in this case. As alleged in the *Complaint*, Fluent, acting in concert with other parties to violate the CAN-SPAM Act in various ways, specifically targeted thousands of commercial emails at Utah residents, thereby causing actual and statutory injury to XMission in Utah. The law requires much less to establish jurisdiction over Fluent in Utah and the Court should deny Fluent's *Motion to Dismiss*.

## Statement of Facts

Fluent's business depends on acquiring demographic, psychographic, and behavioral data about consumers so it can serve personalized advertisements or sell consumers' personally identifiable information. *See* http://fluentco.com. The www.fluentco.com home page states:

> Fluent is a people-based marketing platform that uses real-time, one-to-one interaction to create custom audiences and serve personalized ads that drive performance at scale.

> Data is at the heart of what we do. And we believe that the best data sets are not static. They are dynamic, just like people are. That's why we collect fresh, first party data from millions of new registered users every day to deterministically target the right people and deliver real results.

P0092-93 (last visited Apr. 3, 2018). More specifically:

> Marketers face an uphill battle. Thanks to the proliferation of digital media and devices, there is more data available to them than ever before and using the "right" data is key to success. It has to be fresh, recently collected data in order to accurately target the right audience with the right offers and drive results. That's where we come in. Fluent's platform is rooted in first-party data collected in real-time on a perpetual basis to evolve how brands target and engage with consumers. We go beyond anonymous pixels and cookies and interact with real people in order to deliver scalable performance marketing programs.

> We don't have to guess what people want. We know what they want. Which enables us to target the right audience at scale.

> High Volume. Fluent interacts with millions of registered users across our network and captures six million survey responses from them daily. Rooted in performance, our Agile Audience Engine can connect your brand to millions of engaged, potential new customers based on the first-party data we capture every day to drive results and perpetual optimization.

> High Value. Fluent was founded on the belief that modern marketers need more efficiency. Performance driven, we concentrate on delivering qualified audiences, not vanity metrics. At Fluent, your success is our success.

> High Velocity. Fluent is highly responsive and enables you to capture data from real people in a 1:1 conversational way. Our technology captures consumer preferences that you can activate on in real time.

P0088-91 (last visited Apr. 3, 2018).

Fluent's entire business is predicated on convincing actual consumers, in this case

XMission customers residing in Utah, to give myriad personal information, so Fluent can then

sell that data and target potential customers. *See id*. The information that Fluent collects is not

merely aggregated; rather, Fluent ties all of that information to a consumer's actual name, gender,

birthday, physical address, and email address. *See* P0075-86.

6

To complete its objective which is clearly outlined on its website, Fluent uses a sophisticated technical web, which relies at the first step on the unlawful dissemination of thousands of spam email through XMission's server network in Utah which are linked to many websites ostensibly controlled by Fluent's wholly owned subsidiaries. For example, Reward Zone USA, LLC, ("Reward Zone"), the sole member of whom is Fluent, LLC (*see Operating Agreement* P0097), under Fluent's express direction and control, registers and operates many domains that are linked to the emails in question and through which Fluent gathers personal information from its targeted recipients.[3] *See* fn 4 herein. Similarly, Fluent also formed and controls other entities such as Rewardsflow LLC ("Rewardsflow") (*see Operating Agreement* P0105) and American Prize Center, LLC ("American Prize Center") (*see Operating Agreement* P0113) and operates them with a similar purpose.

Regarding the transmission of the emails that are linked to Fluent's data gathering websites, Fluent admits that it participates in the advertising, that it provides advertising content to the publishers; and that it pays the publishers when a recipient clicks on the emails. *See* ECF 23 at ¶ 4. In this particular case, Fluent participation extended to over 10,000 emails to XMission customers residing in Utah. Those emails linked the recipients directly to Fluent controlled data gathering domains. Specifically: onlineretailusa.com (747 emails at issue), restaurantpromotionsusa.com (7,397 emails at issue), retailpromotionsonline.com (914 emails at

---

[3] The emails in question purport to offer free products or gift cards. When the links in the emails are clicked, the recipient, in this case, XMission customers in Utah, are sent to a domain where a survey or similar questionnaire is hosted and designed to gather personal information for Fluent. In an attempt to distance itself from its unlawful conduct, Fluent established a large web of companies to use to register and host the domains. It's this business organization strategy that allows Fluent to claim that it does not have any direct contact with the Utah consumers.

SLC_3669321

issue), surveysandpromotionsonline.com (553 emails at issue) and others.[4] P004, ¶17. As

Fluent boasts on its website, it has the ability to "target the right audience at scale." Presumably,

when it paid to have the 10,141[5] emails at issue sent into Utah to XMission customers through

XMission's servers, it was using its prolific skills to "target the right audience," i.e., thousands of

Utah consumers, and "collect fresh, first party data from" them. *See* P0093.

XMission is a Utah entity that operates as a traditional Internet service provider. *Id.*, at

¶0003, ¶¶4-11. As part of its Internet access services, XMission hosts many third party domains

and provides email for those domains in Utah. *Id.*, at ¶¶11, 13, 18-19. It also hosts its own

domains, xmission.com and xmission.net and provides email for them as well. *Id.,* at ¶11. The

publicly available registration information in the WHOIS database for these domains identifies

XMission as being located in Utah. *Id.*, at ¶12; *also* P0006-12. Any email sent to any domains

hosted by XMission will, by design, arrive on XMission's email servers in Utah. *Id.*, at ¶13.

Between 2015 and present, Fluent paid its publishers to transmit at least 10,141 emails to

XMission customers in Utah. In response to the emails Fluent caused to be sent into Utah,

XMission has received 5,271 customer complaints of spam, which directly affects XMission's

reputation and good will with its customers as well as the perceived quality of its services.

---

[4] *See http://*onlineretailusa.com (stating "RewardZone USA administers this website") (P0121);
*http://*restaurantpromotionsusa.com (stating "RewardZone USA administers this website") (P0075);
*http://*retailpromotionsonline.com (stating "RewardZone USA administers this website") (P0123); *http://*
surveysandpromotionsonline.com (stating "RewardZone USA administers this website") (P0126); *see
also* Terms & Conditions of each site, which provides a link to contact.rewardzoneusa.com/policies/terms
(identifying the website as a "REWARDZONEUSA, LLC WEBSITES"). P0129

[5] Since it filed its Complaint, XMission has identified additional Fluent emails, and Fluent has sent
addition emails to XMission's customers for a total of 10,354 emails to date.

P0005, ¶23. XMission has suffered actual harm as the result of Fluent's marketing activities in Utah. *Id*., at ¶¶23-25.

Among the 10,141 emails are 1,293 (12.7% of the total) which were specifically targeted at email addresses that contain Utah in the domain name. *See* P0004, ¶19. Not only are the recipients of the emails located in Utah, the actual email addresses identify the location of the recipients. Further, the WHOIS registration information for the domains identifies such as being located in Utah. *See id*., at ¶¶20-21; *also* P0031-71. Further, a number of the Fluent emails were actually sent to XMission from within the state of Utah.  *See* P0004, ¶22; *also* P0072-74.

Fluent's stated objective is to "collect fresh, first party data from millions" such as "customer preferences[,] and states that it successfully "capture six million survey responses" daily, part of which is a physical address information. P0089, 93.  To convince consumers to give up their valuable personally identifiable information, Fluent purports to offer "incentives" delivered through deceptive commercial emails like those 10,141 emails at issue in this lawsuit, ranging from store gift cards to Apple products. *See* P0013-30. Although the emails purport to come from companies such as Chili's, Starbucks or Chick-Fil-A, in fact, the emails are actually paid for and sent into the stream of commerce by Fluent with the assistance of its marketing agents (*see* ECF 23 at ¶4), and are not sent by the named companies. Once a party clicks through one of the Fluent emails and provides some preliminary information to Fluent, such as age, and email address, Fluent requests a zip code. P0075-86. Upon receiving the zip code, Fluent's website automatically populates the city and state, and then asks for a specific street address. *See* P0082. Fluent aggregates all of this consumer information. In other words, it knows who is who, and where they are located.

9

## Legal Standard

To obtain personal jurisdiction over a nonresident defendant, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment. *Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1074 (10th Cir. 1995). Accordingly, Utah law governs the exercise of personal jurisdiction over defendants, so long as it satisfies due process. *See id.*; *see also Soma Med. Int'l v. Standard Chartered Bank¸* 196 F.3d 1292, 1295 (10th Cir. 1999).

In addressing a motion to dismiss for lack of personal jurisdiction, Plaintiff's factual allegations must be accepted as true and all reasonable inferences to be drawn from those facts must be made in the light most favorable to plaintiff. *See Pohl, Inc. of Am. v. Webelhuth*, 2008 UT 89, ¶2, 201 P.3d 944. Moreover, plaintiff is "only required to make a prima facie showing of personal jurisdiction" and "any disputes in the documentary evidence are resolved in [plaintiffs'] favor." *Neways, Inc. v. McCausland*, 950 P.2d 420, 422 (Utah 1997) (citation omitted); *see also Hafen v. Strebeck*, 338 F. Supp. 2d 1257, 1260 (D. Utah 2004) ("All factual disputes are resolved in the favor of the plaintiff" (citation omitted)). Plaintiff is also permitted to bring additional evidence in support of jurisdiction. *See Roskelley & Co. v. Lerco, Inc.*, 610 P.2d 1307, 1310 (Utah 1980).

## Argument

## I.    THIS COURT HAS PERSONAL JURISDICTION OVER FLUENT

Because the Utah long-arm statute is coterminous with the exercise of jurisdiction under the U.S. Constitution, due process governs the inquiry. However, it is important to note that Utah's long-arm statute was enacted "to ensure maximum protection to citizens of this state,

10

[and] should be applied so as to assert jurisdiction over nonresident defendants to the fullest

extent permitted by the due process clause of the Fourteenth Amendment . . . ." Utah Code §

78B-3-201(3); *see also Starways, Inc. v. Curry,* 1999 UT 50, ¶7, 980 P.2d 204 (quoting

*Synergetics v. Marathon Ranching Co.,* 701 P.2d 1106, 1110 (Utah 1985)).

 Under a due process analysis, "defendants must have 'minimum contacts' with the forum

state, such that having to defend a lawsuit there would not 'offend traditional notions of fair play

and substantial justice.'" *Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1070

(10th Cir. 2008) (quoting *Int'l Shoe v. Washington*, 326 U.S. 310, 316 (1945)). Personal

jurisdiction may be either general or specific. *See id.* While Defendants' contacts in this case are

sufficient for purposes of general personal jurisdiction, the arguments related thereto are

subsumed in the specific jurisdiction analysis below and are not separately addressed.

 With respect to specific personal jurisdiction, three elements are required. First, the

defendant must have had "minimum contacts" with the forum. It is well established that

"different results should not be reached simply because business is conducted over the internet."

*Fenn v. Mleads Ent. Inc.*, 2006 UT 8, ¶12, 137 P.3d 706, 711. Second, "the plaintiff's injuries

must 'arise out of' defendants' forum-related activities." *Id* (quoting *Burger King*, *Corp. v.

Rudzewicz*, 471 U.S. 462, 472 (1985)). Third, "exercising personal jurisdiction over defendants

must always be consistent with traditional notions of fair play and substantial justice." *Id.* at 1071

(citing *Int'l Shoe Co.* at 316).

 Although the plaintiff bears the initial burden to establish personal jurisdiction, "where,

as here, the issue is raised early on in litigation, based on pleadings (with attachments) and

affidavits, that burden can be met by a prima facie showing." *Shrader v. Biddinger*, 633 F.3d

1235, 1239 (10th Cir. 2011); *see also Dudnikov* at 1070. Factual disputes must be resolved in the plaintiff's favor. *Neways* at 422. As discussed further below, the exercise of specific personal jurisdiction over Fluent is well warranted in this case, because Fluent has numerous intentionally-created contacts with the state of Utah, and the exercise of jurisdiction comports with due process.

### A. Fluent purposefully directed its conduct at Utah and placed its products which harmed XMission in Utah into the stream of commerce.

"Personal jurisdiction exists when 'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" *Diesel Power Source, L.L.C. v. Crazy Carl's Turbos, Inc.*, 2015 WL 1034231, *8 (D. Utah 2015) (unpublished) (citation omitted). In the Tenth Circuit, the purposeful direction analysis is based on what has become known as the "*Calder* effects" test, based upon *Calder v. Jones*, 465 U.S. 783 (1984). *See Shrader*, 633 F.3d at 1239. Under the *Calder* test, purposeful direction is established if three showings are made: (1) the defendant commits an "intentional action"; (2) that is "expressly aimed at the forum state"; (3) with harmful effects in the forum state. *See Dudnikov* at 1072.

To make the analysis in this case simple, the Calder test can be satisfied through the 'knowing and repeated transmission of computer files [i.e., such as emails] over the Internet." *Fenn* at ¶16 (citing *MSF Series Trust III v. Grainger*, 2004 UT 61, ¶11, 96 P.3d 927). In fact "emails, merely through their nature and quality, may rise to the level that creates a substantial connection between the defendant and Utah." *Id.* at ¶17; *see also Melaleuca, Inc. v. Hansen*, 2008 WL 2788470, *5 (D. Idaho 2008) (unpublished) (finding "purposeful availment" where

12

defendant only sent "over one hundred e-mails . . . .")[6]. Further, "where the defendant deliberately has engaged in significant activities within a State, he manifestly has availed himself of the privilege of conducting business there" and is likewise subject to the jurisdiction of the Court. *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 905 (10th Cir. 2017).

This case involves the continuous, repeated, and deliberate sending of thousands of deceptive commercial email messages targeting Utah residents with the sole purpose of directing Utah customers to linked websites controlled by Fluent that are used to surreptitiously gather personal information from citizens in Utah. Through their nature and quality, Fluent's emails that direct Utah citizens to their data gathering websites rise to the level that creates a substantial connection between the Fluent and Utah. Moreover, even if Fluent did not have actual knowledge of where the emails were being sent (though the evidence does not support this conclusion), such ignorance is irrelevant as the jurisdiction analysis does not "permit corporations to hide behind the excuse of ignorance in not knowing where they . . . send email[s]. . . ." *Fenn* at ¶17. In other words, if the company knowingly engages in repeated transmission of computer files (i.e. emails) over the Internet, which Fluent admittedly did with the active assistance of its publishers, it does not matter whether the companies actually know where the Internet transmissions are taking place. *See id*.

As set forth herein, Fluent's conduct readily amounts to purposeful direction under these principles, both because of the sheer duration and quantity of the repeated and continuous

---

[6] In *Hansen*, the plaintiff provided evidence that the defendant directed e-mails to residents of the forum state, and that he was aware they were located in that state. Additionally, of the over one hundred emails sent into the forum state, many of them were personalized with the individual's name. The Court held that these contacts were substantial enough in substance and in number to constitute purposeful availment. Here, Defendants directed over 10,000 emails (100 times the number of emails in *Hansen*) to residents of Utah, and a huge percentage of those emails contained domains that specifically identified Utah.

transmission of computer files into Utah, which to date appear to be ongoing, and because the Defendants have directed their conduct directly at the forum audience and have made Utah the focal point of their conduct, causing actual harm in Utah.

1. Defendant's conduct was intentional.

Fluent admits that it participates in advertising and marketing campaigns, provides advertising content to publishers and intentionally pays publishers to disseminate emails on its behalf. ECF 23 at ¶4. Further, Fluent, on its website, admits that it targets specific consumers and intentionally collects consumer data. Without the intentional action of Fluent, the emails in question could not have been sent. *See id*. Further, without the intentional actions of Fluent in establishing data collection websites, and linking its email to those websites, the emails would have no purpose. Fluent's intentional actions resulted in XMission's receipt of 10,141 emails each of which promotes a Fluent website, and each of which was intentionally sent to recipients who are in Utah. As outlined in the *Complaint*, which must be accepted as true, each of the emails violated the CAN-SPAM Act in one or more ways.

At this stage, when Plaintiff's allegations are deemed true and all disputed facts are resolved in Plaintiff's favor, there is no dispute that the conduct in question was the intentional creation and transmission of commercial email messages, that the emails violate the CAN-SPAM Act, and that the emails were sent into Utah to recipient email addresses that contain the domain names hosted by XMission in Utah.

2. Defendants purposefully aimed and directed its conduct at the forum state

The *Zippo* sliding scale test is informative of the purposeful direction analysis. *See Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Penn. 1997). On one end of the scale

14

are defendants that do business directly over the internet—e.g.., by entering into contracts with citizens of a foreign state—and so are subject to personal jurisdiction. *Id.* at 1124. At the opposite end are defendants who simply post information on the internet for passive consumption, which cannot alone give rise to jurisdiction. *Id.* The middle ground consists of defendants who operate interactive websites, whereby users engage with or exchange information with the defendant without formally conducting business. These activities are evaluated on a case-by-case basis to determine "the level of interactivity and commercial nature of the exchange of information." *Id.* The policy behind this approach is that "the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and qualify of commercial activity that an entity conducts over the Internet." *Id.*

While the Tenth Circuit has declined to formally adopt the *Zippo* test, it has used the framework to inform its application of traditional personal jurisdiction principles to internet activity—specifically, whether an entity's activities are directed toward Utah. *See, e.g.*, *Shrader v. Biddinger*, 633 F.3d 1235 (10th Cir. 2011); *Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292 (10th Cir. 1999). Similarly, the District of Utah has either relied on the *Zippo* framework or adopted the test in its entirety in several of its holdings. *See Nutramarks, Inc. v. Life Basics, LLC*, 2017 WL 2178422, *3 (D. Utah May 17, 2017) (holding that "*Zippo* offers a helpful framework for analyzing [the defendant's] online activities") (unpublished); *Parah, LLC v. G'Strat LLC*, 2014 WL 545871, *3–4 (D. Utah Feb. 10, 2014) (utilizing the *Zippo* test for its jurisdictional analysis) (unpublished); *Zing Bros., LLC v. Bevstar, LLC*, 2011 WL 4901321, *3– *4 (D. Utah Oct. 14, 2011) (same) (unpublished).

15

Under the *Zippo* framework, Fluent's marketing tactics are sufficient to conclude that Fluent has purposefully directed its internet activity to Utah. As previously described, the 10,141 emails sent to Utah consumers link directly to websites controlled by Fluent. P0097-104, 75-86, 121-130. These websites are highly interactive and, in fact, are specifically designed to extract data from the email recipients. P0075-86. The information requested includes the recipient's address, and Fluent's websites automatically populate the city and state, including Utah based on the zip code of the recipient. *See id*. Accordingly, Fluent's internet activity and websites are not only highly interactive, they are also commercial in nature. Courts in Utah have held that this is strong evidence of purposeful direction, as the defendant clearly contemplated that its activity would reach that state's citizens. *See, e.g., Zing Bros.*, 2011 WL 4901321 at *3 (exercising jurisdiction over the defendant based, in part, on the "specific inclusion of Utah in the drop down list of states" to which customers could ship product); *Para, LLC*, 2014 WL 545871 at *4 (exercising jurisdiction based in part on the fact that the defendant' website allowed customers to "select any state within the United States from a drop down menu" for delivery).

In addition to the foregoing, "Continuous and deliberate exploitation of the forum state market can satisfy the minimum contacts standard for specific jurisdiction over an out-of-state defendant . . . ." *Old Republic* at 914. As of the date of the original *Complaint* [ECF 2], Fluent had caused the transmission of at least 10,141 commercial emails to XMission's servers in Utah. Defendants' transmission of emails into Utah has been continuous, repeated and ongoing since 2015 or earlier. P0003, ¶14. In fact, Fluent emails have continued to be transmitted to XMission

16

customers' email addresses since XMission filed its original *Complaint* on Feb. 27, 2018.[7]

P0004, ¶15. Each of the thousands of emails is a part of Fluent's continuous and deliberate

exploitation of consumers in Utah. In fact, Fluent's entire business is built on the exploitation of

consumer information set in motion by deceptive email advertisements, the purpose of which is

to induce Utah consumers to visit Fluent's data gathering website and divulge their personal

information and data.

     Moreover, Fluent could have easily avoided litigation in Utah if it so chose. XMission's

domains, as well as the other recipient domains in question, are publicly registered domains in

the WHOIS database. P0006-12, 33-71. "WHOIS is a publically available online database

through which users can access information regarding domains, including the registrant's name,

address, phone number, and email address." *See Gordon v. Virtumundo*, 575 F.3d 1040, 1064, n.

22 (9th Cir. 2009).[8] WHOIS information is public and is available online from anywhere on

earth wherever there is Internet. The recipient domain WHOIS information identifies the

recipient's locations as Utah. *See id*.

     An appropriate parallel can be drawn between domain name registration and the

registration of a trademark. In each case, the publicly registered information puts the world on

notice of the name and the owner's location. In *System Designs, Inc. v. New Customware Co.*,

this Court analyzed jurisdiction in the context of trademark infringement. After analyzing due

process and the *Calder* effects test, the Court concluded,

---

[7] Since XMission filed its *Complaint* (and as of May 11), Fluent had transmitted an additional 23 emails to XMission's customers.
[8] Citing *Definitions, Implementation, and Reporting Requirements Under the CAN-SPAM Act*, 70 Fed.Reg. 25,426, 25,446 n. 233 (proposed May 12, 2005) (to be codified at 16 C.F.R pt. 316)).

> Trademarks are registered in a national database, accessible to anyone. . . . Not only does this establish a constructive notice as to the right to use the mark, it also establishes a constructive notice as to where the mark is registered. Therefore, to avoid suit in Utah, New CustomWare needed only to look up the CustomWare mark *before* it chose to adopt it for its company name. A search would have quickly revealed that CustomWare was a registered Utah trademark, thereby warning New CustomWare it might be subject to suit in Utah if it choose to use that mark.

248 F.Supp. 2d 1093, 1098–99 (D. Utah. 2003).

Here, to avoid suit in Utah, Fluent needed only to look up the recipient emails domains in WHOIS before it chose to send thousands of unlawful commercial emails to them. A search would have quickly revealed that the domains are in Utah, thereby warning Fluent that it might be subject to suit in Utah if it chose to send false and misleading emails to addresses with those domains.

In addition to foregoing, in this case, there is an added layer of clear and convincing evidence that the Defendants purposefully aimed their conduct at the forum state. Specifically, at least 1,293 of the commercial emails specifically identify Utah in the targeted domain names. P0004, ¶19. These emails that on their face target Utah residents (as opposed to emails blindly sent to Utah), constitute approximately 12.7% of the total emails.[9]

When jurisdiction is viewed within the context of the actions Defendants actually took, there is no genuine argument that the Court lacks jurisdiction over them. In fact, it is precisely Defendants' type of conduct that constitutes purposeful availment of the Utah forum, such that it is both foreseeable and reasonable that the Defendants would be haled into a Utah court.

---

[9] It is worth noting that had XMission sued the Defendants exclusively for the ____ emails that specifically targeted Utah residents, there would be no question of jurisdiction as 100% of the emails in question would have targeted Utah. The fact that other emails were sent that did not specifically mention Utah, does not limit the effect of the repeated targeting in which Fluent did engage.

3. <u>The harmful effects of Fluent's actions were felt in Utah.</u>

Fluent's argument relies almost exclusively on its self-serving statement that it does not click send on the actual emails and therefore did not direct its emails to Utah. However, whether Fluent was the party who clicked send is irrelevant because Fluent put the products into the stream of commerce that resulted in harm in Utah.

The Supreme Court recognized in *World-Wide Volksagen Corp. v. Woodson*, that "the forum state does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state." 444 U.S. 286, 298 (2012). Under this principle, a party cannot avoid availing itself of personal jurisdiction through an intermediary where it is evident that the party purposefully directed commercial activity toward Utah residents. *See Parah, LLC v. G' Strat LLC*, 2014 WL 545871 *3 (D. Utah 2014); *Del Sol, L.C. v. Caribongo, LLC*, 2012 WL 530093, *5 (finding personal jurisdiction over a defendant that linked its site to a third party distributor, "with the expectation that the products would be available for purchase throughout the country. . .").

For example, in *Parah*, the plaintiff sued the defendant in Utah for various intellectual property claims. The defendant argued that Utah did not have jurisdiction because the defendant never sold its products to Utah residents directly. *Id.* at *3. Rather, the residents purchased the products through a third party website. *Id.* The Court held that it did not matter that the residents purchased the products through a third party, where there was evidence that the defendant "directed its activities" toward Utah. *Id.* at *5. The Court's holding on this issue was based on: "(1) sales of Defendant's [products] to Utah; (2) the specific inclusion of Utah in the drop down

19

list of states [available for delivery on the Defendant's website]; (3) the distributor and advertising partnership with [the third-party]; and (4) [the third-party's] website, which included videos on the products featuring the Defendant." *Id.* at 5.

The situation here is analogous to *Parah* and each of the factual circumstances supporting personal jurisdiction in *Parah* are present here. To the first factor, Fluent's digital marketing and advertising content are its "products," from which Fluent gathers data from consumers to its own financial gain. This content was indisputably disseminated into Utah via email in thousands of different Internet transactions. Second, the emails at issue direct recipients to a Fluent-owned website, where they are asked to provide contact information. The contact information menu allows recipients to select from any state in the country, including Utah. Further, Fluent has received responses from citizens of Utah to their false advertising. As the Court found in *Parah*, this is evidence showing that Fluent contemplated its content reaching within the bounds of Utah, and in fact, knew or had constructive knowledge that it did reach within the bounds of Utah. The final two factors deal with the relationship of the product-maker and product distributor to determine the extent to which the defendant authorized the product's dissemination. *See id.* at *3-4. Fluent has admitted that it contracts with third-party publishers to send out its content and, by virtue of this relationship, has authorized the publishers to disseminate its content anywhere in the country.

In sum, Fluent provides its content—i.e., its product—to third-party publishers with the intent that they disseminate the products nationwide. The publishers' primary function, like the third-party distributor in *Parah*, is solely to disseminate this content. Fluent hopes to avoid personal jurisdiction for directing this commercial activity to Utah by hiring a third-party

20

publisher to press send on the emails disseminating this content. However, the fact that the marketing and advertising content was sent by a third party does not protect Fluent from personal jurisdiction where there is overriding evidence that it placed its content into the stream of commerce and intended that content to reach Utah.

Regarding harm suffered by ISPs like XMission for unlawful emails, Congress found that,

> The receipt of unsolicited commercial electronic mail may result in costs to recipients who cannot refuse to accept such mail and who incur costs for the storage of such mail, or for the time spent accessing, reviewing, and discarding such mail, or for both. . . .
>
> The receipt of a large number of unwanted messages also decreases the convenience of electronic mail and creates a risk that wanted electronic mail messages, both commercial and noncommercial, will be lost, overlooked, or discarded amidst the larger volume of unwanted messages, thus reducing the reliability and usefulness of electronic mail to the recipient . . . .
>
> Some commercial electronic mail contains material that many recipients may consider vulgar or pornographic in nature. . . .
>
> The growth in unsolicited commercial electronic mail imposes significant monetary costs on providers of Internet access services, businesses, and educational and nonprofit institutions that carry and receive such mail, as there is a finite volume of mail that such providers, businesses, and institutions can handle without further investment in infrastructure.

15 U.S.C. § 7701(a)(3)–(6). In the context of unlawful email, there is no other place where the brunt of injury would be felt other than in the state where the emails, placed into the stream of commerce by Fluent in this case, are received. Moreover, XMission suffered actual harm as the direct result of the emails in the form of 5,271 customer complaints of spam, resulting in harm to its reputation and good will in Utah.  P0005, ¶23-25.

21

Further, even if Defendants did not know before this lawsuit that its emails were causing harm in Utah[10], its continued, unlawful emailing after the *Complaint* had been filed, and up through the date of XMission's filing of this brief, constitutes conduct, the harm for which the Defendants' have absolute knowledge will be felt in Utah.

The court must, of course, consider the foregoing *Calder* factors collectively rather than in isolation. *See Far West* at 1090 ("Our review of the post-*Calder* decisions indicates that . . . in order to resolve the jurisdictional question, a court must undertake a particularized inquiry as to the extent to which the defendant has purposefully availed itself of the benefits of the forums' laws."). Taking the factors together compels the conclusion that there are sufficient minimum contacts to justify exercising specific personal jurisdiction under the due process test.

**B.  There is nexus between Defendants' conduct and Plaintiff's claims.**

Nexus simply requires that there be some connection between the defendant's action and the plaintiff's injury that is not too remote. *See Burger King* at 472. In other words, plaintiff's injuries must "arise out of or relate to [Defendant's] activities." *Pro Axess, Inc. v. Orlux Dist. Inc.*, 428 F.3d 1270, 1278–79 (10th Cir. 2005) (citing *Burger King* at 472). This is true under

---

[10] In *System Designs* cited above, the Court stated, "In light of easy nationwide accessibility of the trademark registry, an argument can be made for specific personal jurisdiction based on an allegation of trademark infringement alone. Under *Calder,* the 'effects' of the infringement are easy to determine: there is a *national listing* indicating exactly which state will feel the 'effects' of the infringement." *System Designs* at 1099 (emphasis in original). Applying the same logic here, in light of the easy nationwide accessibility of the WHOIS registry, an argument can be made for specific jurisdiction based on an allegation of CAN-SPAM violations alone. Under *Calder,* the "effects" of the unlawful emailing are easy to determine: there is a national listing indicating exactly which state will feel the "effects" of the unlawful emailing. In this case, Utah.

both the "but for" and "proximate" cause" tests[11] utilized in the Tenth Circuit to assess whether a plaintiff's claims are linked to defendant's forum-related activities.

The "but for" test inquires whether "any event in the causal chain leading to the plaintiff's injury is sufficiently related to the claim to support the exercise of specific jurisdiction." *Dudnikov* at 1078. As to the "but for" test, the contacts in this case include the Defendant's transmission of thousands of unlawful emails to XMission's email servers in Utah, including their deliberate targeting of thousands of unlawful emails to Utah residents. But for these activities, which nearly exclusively form the bases of XMission's claims, XMission would not have been injured and its claims would not have arisen.

In applying the "proximate cause" test, courts assess "whether any of the defendant's contacts with the forum are relevant to the merits of the plaintiff's claim." *Dudnikov* at 1078. As stated by the Utah Supreme Court in *Fenn*, "[i]t is conceivable . . . that sending mass emails into Utah, or even a threatening or otherwise tortious individual email, may result in a substantial connection between the defendant and Utah if the nature and quality is such as to have a meaningful impact on Utah and its citizens." *Fenn* at ¶17. Defendants' emails had a meaningful impact on Utah and its citizens. Each of the emails sent by Fluent targeted XMission account holders with deceptive and fraudulent marketing appeal. Each was received and processed by XMission in its Utah data and storage facility. Each of the recipient's email accounts is hosted on XMission's servers in Utah, and XMission has suffered actual harm, in Utah, as the result of its receipt Defendants' emails, including its receipt of 5,271 customer complaints. *See* P0__.

---

[11] The Tenth Circuit has not yet resolved the question of whether the "but for" or the "proximate cause" test governs the arising out of inquiry. *See, e.g., Younique, LLC v. Youssef*, 2016 WL 6998659, *4 (D. Utah 2016).

Fluent's actions in sending mass emails into Utah had a meaningful impact on XMission, a Utah company and the Utah resident recipients of the emails, and a substantial connection exists. Moreover, Plaintiff is not XMission's only connection to Utah. Defendants are connected to Utah through the thousands of emails they sent to XMission's email servers in Utah, through the thousands of emails that specifically targeted at Utah residents, through its other customers from whom it derives around one percent of its income (*see* ECF 23 at ¶ 18) and through the fact that a number of Fluent's emails were actually sent from within the state of Utah.

## C. Exercising personal jurisdiction over Fluent is consistent with traditional notions of fair play and substantial justice.

As noted above, the final inquiry is whether "the exercise of personal jurisdiction would 'offend traditional notions of fair play and substantial justice.'" *Dudnikov* at 1080 (quoting *Int'l Shoe* at 316). Courts generally consider a number of non-exclusive factors in connection with this inquiry, including:

> (1) the burden on the defendant, (2) the forum state's interests in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effectual relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states [or foreign nations] in furthering fundamental social policies.

*Id.*; *see also Kindig It Design*, 157 F. Supp. 3d 1167, 1180 (D. Utah 2016). Once minimum contacts are established, "it is incumbent on defendants to 'present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Id.* (quoting *Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1280 (10th Cir. 2005)). Defendants have presented no such case.

24

The stated burden on Fluent in this case is minimal and is limited to the fact that Fluent is an out of state entity. However, as the court determined in *Kindig It Design*, "[i]n the modern world of air transportation and digital communication, the court has no difficulty in finding that litigating in Utah will not create so substantial a burden on Creative Controls as to violate Due Process." *Kindig It Design* at 1180. Regarding evidence, this is a case about email, and every single one of the emails in question is presently located on XMission's servers in Utah.

The second factor also shows that due process is not violated, because Utah has a significant interest in protecting its citizens against false advertising such as the advertising at issue in this case, which induced its citizens to provide sensitive personal identifying information.

Factors three, four, and five support the exercise of jurisdiction, because XMission has a strong interest in obtaining relief in this location, where it operates and where it is suffering acute injury. The interstate judicial system likewise has an interest in efficiently resolving this dispute and thereby promoting justice, which can be accomplished in this forum without delay.

Exercising personal jurisdiction over the XMission will not offend traditional notions of fair play and substantial justice, particularly since minimum contacts have been established, and Fluent's extensive contacts show it reasonably should expect to be haled into court in this jurisdiction. Accordingly, the motion to dismiss for lack of jurisdiction should be denied.

## Conclusion

Based on the foregoing, the Court should deny Defendants' Motion to Dismiss.

25

DATED this 26th day of May, 2018.

DURHAM JONES & PINEGAR, P.C.


/s/ Jordan K. Cameron
Jordan K. Cameron
*Attorneys for Plaintiff*

SLC_3669321

## <u>CERTIFICATE OF SERVICE</u>

This is to confirm that a copy of the foregoing was electronically filed on May 26, 2018. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system, and the filing may be accessed through that system.

Maralyn M. English
Scott Young
SNOW, CHRISTENSEN & MARTINEAU
10 Exchange Place, Eleventh Floor
Post Office Box 45000
Salt Lake City, Utah 84145

Leeor Neta
NEWMAN DU WORS LLP
505 Montgomery Street, 11th Floor
San Francisco, CA 94111
leeor@newmanlaw.com

/s/ Kim Altamirano
Kim Altamirano

SLC_3669321