# Exhibit A –
# Memorandum Decision and Order

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ZOOBUH, INC., <br><br>       *Plaintiff*, <br><br> v. <br><br> SAVICOM, INC., d/b/a MINDSHARE DESIGN, *et al.*, <br><br>       *Defendants*. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS** <br><br> Case No. 2:17-cv-01098-JNP <br><br> District Judge Jill N. Parrish |

## I.  INTRODUCTION

This case concerns emails that were allegedly sent in violation of the Controlling the Assault of Non-Solicited Pornography and Marketing Act ("CAN-SPAM"), 15 U.S.C. §§ 7701–7713. Plaintiff Zoobuh, Inc. is an email service provider. It alleges that the defendants sent thousands of emails to its customers. The emails allegedly violated CAN-SPAM because, among other reasons, they contained misleading information: many of the emails purported to be from actual people when, in fact, they were computer generated. Defendants Savicom, Inc. d/b/a Mindshare Design ("Mindshare") and DG International Limited LLC ("DGI LLC") move to dismiss the claims against them based on lack of personal jurisdiction. They also move to dismiss Zoobuh's second cause of action on the grounds that it fails to state a violation of CAN-SPAM. Finally, Mindshare moves to dismiss the remaining claims against it on the grounds that it is not alleged to have violated CAN-SPAM.

## II.      BACKGROUND[1]

Zoobuh is a Utah corporation with its principal place of business in Utah County, Utah. Zoobuh provides email services to its customers, and it owns all of the servers, routers, and switches on its network. Every Zoobuh email account is registered, hosted, and serviced through Zoobuh's hardware.

Mindshare is a California corporation with its principal place of business in Oakland, California. Mindshare is an email service provider. It provides its customers with a platform that its customers can use to create and send emails.[2]

DGI LLC is a Delaware limited liability company with its principal place of business in New Castle, Delaware. Defendant Sylvia van Baekel[3] is the director of DGI LLC. DGI LLC is an email marketing company. It entered into a contract with Defendant DG International Limited ("DGI Limited"), a foreign entity.[4]

---

[1] The following facts are drawn from Zoobuh's first amended complaint as well as the declarations and other evidence that the parties have submitted in connection with the motion to dismiss. Zoobuh has submitted a declaration from its CEO, F. Alan Fullmer. Fullmer Decl., ECF No. 33-1 at 2. Mindshare has submitted a declaration from its chairman, John Ludgey. Ludgey Decl., ECF No. 28-1. And DGI has submitted a declaration from its director, Sylvia van Baekel. Baekel Decl., ECF No. 28-2.

[2] In its briefing, Mindshare claimed that it does not draft its clients' emails, that it does not know to whom its clients send emails, and that it does not review the contents of its clients' emails. But at oral argument, counsel for Mindshare expressed uncertainty as to the veracity of these claims. As such, the court will not rely on them when resolving the pending motion.

[3] Zoobuh has not served Ms. van Baekel. Therefore, she has not answered or otherwise responded to the first amended complaint. *See* Fed. R. Civ. P. 12(a)(1)(A)(i) (providing that a defendant must serve a responsive pleading "within 21 days after being served with the summons and complaint"). The court has granted Zoobuh the right to engage in limited discovery concerning the location of Ms. van Baekel. ECF No. 39 at 2 (holding that Zoobuh may issue a single discovery request to DGI LLC requesting information that identifies the physical location of Ms. van Baekel).

[4] DGI Limited was served with Zoobuh's amended complaint and failed to answer, so the clerk of the court issued a certificate of default as to DGI Limited. ECF No. 48.

DGI LLC, under the contract it entered into with DGI Limited, agreed to send emails to persons on DGI Limited's customer lists. One of the customer lists contained email addresses for persons who had supposedly registered for the dating website xdating.com. DGI LLC used Mindshare's platform to send email advertisements to the email addresses associated with the xdating.com customer list.

Zoobuh alleges that it and its customers have received thousands of email advertisements for xdating.com. All of these emails arrived on Zoobuh's email servers, which are located in Utah. The emails contain links to a registration page for xdating.com. Many of the emails were sent from an email address with the domain suffix @m100.net, which Mindshare registered, owned, and controlled. According to Zoobuh, many of the emails contain misleading information: they purport to identify people registered on xdating.com, but in reality the people identified in the emails do not exist and are not users of xdating.com. Rather, the emails are sent from "virtual cupids": fake users created by DGI LLC or DGI Limited who communicate with users in the same way actual users would. As xdating.com's terms and conditions explain:

> THIS SITE USES FANTASY PROFILES CALLED "ONLINE FLIRT®" In order to enhance your amusement experience, to stimulate you and others to use our Services more extensively, and to generally sprinkle some sparkle and excitement into the Services of XDATING.COM, we may post fictitious profiles, generate or respond to communications by means of automated programs or scripts that simulate or attempt to stimulate your intercommunication with another real human being (though none really exists and any dialog is generated by programming) . . . .

Many of the emails at issue are tailored to the recipient's location, in this case Utah. Some of the emails state, "Hey there [username], these are few [sic] members we've selected for you near Salt Lake City." The emails identify supposed members of xdating.com living in Salt Lake City, Ogden, Sandy, West Jordan, Cedar Valley, West Valley City, Provo, Midvale, Spanish Form, Orem, and Murray—all cities in Utah.

According to Zoobuh, neither it nor its customers elected to receive email advertisements for xdating.com. Rather, Zoobuh believes that its customers are being opted-in to receive emails from xdating.com when, in actuality, the customers are attempting to unsubscribe from xdating.com's email list. Specifically, Zoobuh has an auto-unsubscribe feature that does not distinguish between unsubscribe links and marketing links. As such, the auto-unsubscribe "follows all links." This, according to Zoobuh, has inadvertently resulted in Zoobuh customers being added to the xdating.com customer list.

Zoobuh alleges that all of the emails at issue violate at least one or more provisions of CAN-SPAM. Zoobuh alleges that it has suffered harms to its business, including financial harm, lost time, and server crashes. Zoobuh also alleges that it regularly receives customer complaints concerning spam email. Mindshare and DGI LLC have moved to dismiss the claims against them on a variety of grounds.

## III.   DISCUSSION

Mindshare and DGI LLC move to dismiss the claims against them based on lack of personal jurisdiction. They have also moved to dismiss certain claims on the grounds that Zoobuh fails to state claims upon which relief can be granted. The court first addresses the jurisdictional issues and then addresses the issues that remain.

### A. PERSONAL JURISDICTION: RULE 12(b)(2)

Under Federal Rule of Civil Procedure 12(b)(2), a court may dismiss a party for lack of personal jurisdiction. The plaintiff bears the burden of establishing personal jurisdiction. *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011). When the issue is raised early in the litigation, as is the case here, the burden can be met with a prima facie showing. *Id.* All well-pled allegations in the plaintiff's complaint are taken as true unless they are contradicted by the

defendant's affidavits. *Kennedy v. Freeman*, 919 F.2d 126, 128 (10th Cir. 1990). But if the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor. *Id.*

"Before a federal court can assert jurisdiction over a defendant in a federal question case, the court must determine (1) 'whether the applicable statute potentially confers jurisdiction' by authorizing service of process on the defendant and (2) 'whether the exercise of jurisdiction comports with due process.'" *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1209 (10th Cir. 2000) (quoting *Republic of Panama v. BCCI Holdings (Lux.) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997)).

As to the first prong, CAN-SPAM does not provide for nationwide service of process, so Rule 4(k)(1)(A) instructs this court to apply the law of the state in which the court sits, Utah. *Zoobuh, Inc. v. Williams*, No. 2:13-CV-791-TS, 2014 WL 7261786, at *2 (D. Utah Dec. 18, 2014) (applying Utah's long-arm statute to analyze personal jurisdiction because CAN-SPAM does not authorize nationwide service of process); *see also Trujillo v. Williams*, 465 F.3d 1210, 1217 (10th Cir. 2006) (applying New Mexico's long-arm statute because the federal statute at issue did not, by itself, confer nationwide service of process or jurisdiction on the federal district courts to adjudicate claims). Consequently, the law of the forum state, in this case Utah, and the due process clause govern personal jurisdiction in this case. *See id.*

Utah's long-arm statute extends jurisdiction over defendants "to the fullest extent permitted by the due process clause of the Fourteenth Amendment." Utah Code Ann. § 78B-3-201(3). As such, the personal jurisdiction analysis in this case involves a single inquiry: whether the exercise of jurisdiction over the defendant comports with the due process clause. *See Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017) (holding that

personal jurisdiction analysis required a single due process inquiry because Colorado's long-arm statute extends jurisdiction to the Constitution's full extent).

As to the second prong, "[t]he Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts." *Id.* (quoting *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014)). Under the due process clause, a court may exercise jurisdiction over a defendant so long as: (1) the defendant purposefully established "minimum contacts" with the forum state, and (2) the assertion of personal jurisdiction comports with fair play and substantial justice. *Id.* A defendant's contacts, depending on their quality and quantity, may give rise to either general or specific jurisdiction. *Id.*

### 1. General Jurisdiction

If a court has general jurisdiction over a defendant, it may exercise jurisdiction over the defendant for all purposes (*i.e.*, the plaintiff's cause of action need not arise from the nonresident defendant's contacts with the forum state). *Id.* General jurisdiction exists when an entity's contacts with the forum state are "so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945)). This is a "high burden." *Benton v. Cameco Corp.*, 375 F.3d 1070, 1081 (10th Cir. 2004).

Here, Zoobuh has failed to establish that Mindshare or DGI LLC is subject to general jurisdiction. Zoobuh states that the "Defendants' contacts in this case are sufficient for purposes of general . . . jurisdiction." But instead of explaining why, Zoobuh asserts that its arguments related to general jurisdiction are "subsumed in the specific jurisdiction analysis" and "not separately addressed." Zoobuh does not reference the test for general jurisdiction nor does it explain, even in a cursory manner, how it satisfies the test. In short, Zoobuh asks the court to construct an argument as to why the court has general jurisdiction over Mindshare and DGI LLC.

At best, this is lazy lawyering. At worst, counsel for Zoobuh has run afoul of Rule 11(b) by presenting a legal contention—that the court has general jurisdiction over Mindshare and DGI LLC—that is not warranted by existing law. *See* Fed. R. Civ. P. 11(b). And the latter is more likely the case based on Supreme Court case law. *See, e.g.*, *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1559 (2017) (holding that Montana court lacked general jurisdiction over railway that had "over 2,000 miles of railroad track and more than 2,000 employees in Montana"). Consequently, Zoobuh has failed to establish that the court has general jurisdiction over Mindshare or DGI LLC.[5]

### 2. Specific Jurisdiction

If a court has specific jurisdiction over a defendant, the court may exercise jurisdiction over the defendant only if the plaintiff's cause of action is related to the defendant's contacts with the forum state. *Old Republic*, 877 F.3d at 904. To determine if specific jurisdiction exists, courts first ask whether the plaintiff has shown that the defendant "purposefully directed" its activities at residents of the forum state. *Id.*[6] If so, the court must then determine whether the plaintiff's cause of action "arises out of" the defendant's contacts with the forum state. *Id.* at 908.[7] Finally, if the first two requirements are met, the court must determine whether the defendant has presented "a compelling case that the presence of some other considerations would

---

[5] And even if there were arguments as to why general jurisdiction exists, Zoobuh has waived its right to raise them based on its inadequate briefing. *Cf. Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000) ("This court does not ordinarily review issues raised for the first time in a reply brief.").

[6] The Tenth Circuit "usually use[s] the term 'purposeful direction in the tort context and 'purposeful availment' in the contract context." *Old Republic*, 877 F.3d at 904 n.11. "In any event, the terms 'purposeful direction' and 'purposeful availment' denote the same requirement." *Id.*

[7] "The purposeful direction and 'arising out of' requirements together comprise the minimum contacts analysis." *Old Republic*, 877 F.3d at 909 n.19.

render jurisdiction unreasonable." *Id.* at 909 (quoting *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1080 (10th Cir. 2008)).

    *a.  Purposeful Direction*

To establish minimum contacts with the forum state, the defendant must have "purposefully directed its activities at residents of the forum state." *Id.* at 904 (quoting *Shrader*, 633 F.3d at 1239). This requirement "ensures that [the] defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citations omitted). But where the defendant has deliberately engaged in significant activities within the forum state, the defendant has availed itself of the privilege of conducting its activities in the forum state. *Id.* at 475–76. When this is the case, it is presumptively reasonable to require the defendant to submit to the burdens of litigation in the forum state. *Id.* at 476.

The Tenth Circuit has suggested that there are at least three frameworks for determining whether a nonresident defendant's activities satisfy the "purposeful direction" requirement: (1) continuing relationships with forum state residents; (2) deliberate exploitation of the forum state market; and (3) harmful effects in the forum state. *Old Republic*, 877 F.3d at 905. "The Supreme Court articulated the latter two frameworks in specific jurisdiction cases involving out-of-state media defendants' national distribution of their printed material: *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 777 (1984) (market exploitation) and *Calder v. Jones*, 465 U.S. 783 (harmful effects)." *Id.*

Here, Zoobuh relies on the third framework (harmful effects) to show that Defendants purposefully directed their activities at the forum state. Because Zoobuh relies on *Calder*'s "harmful effects" framework, the court limits its analysis to that framework. *See Dudnikov*, 514 F.3d at 1071 ("While we do not imagine that *Calder* necessarily described the only way to

satisfy the purposeful direction test, because plaintiffs assert it provides the key to unlocking the courthouse door for them, we are able to limit our attention in this case to *Calder*'s demands.").

The Tenth Circuit has summarized *Calder*'s "harmful effects" test to require three elements: (1) the defendant commits an intentional act, (2) the defendant's action is expressly aimed at the forum state, and (3) the defendant knows that the brunt of the injury will be felt in the forum state. *Old Republic*, 877 F.3d at 907 (citing *Dudnikov*, 514 F.3d at 1072).[8] When a defendant's contacts with a forum state occur over the internet, courts "look to indications that [the] defendant deliberately directed its message at an audience in the forum state and intended to harm the plaintiff occurring primarily or particularly in the forum state." *Shrader*, 633 F.3d at 1241.

### b. Arising Out Of

When determining whether specific jurisdiction exists, courts look only to the contacts out of which the plaintiff's cause of action arises. *Id.* at 1243. "There must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.'" *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1781 (2017) (quoting *Goodyear*, 564 U.S. at 919). "When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Id.*

---

[8] In *Calder*, the Supreme Court held that a California court had specific jurisdiction over an employee and officer of the National Enquirer, both residents of Florida, because "their intentional conduct [writing a libelous article] [was] calculated to cause injury to [the plaintiff] in California." 465 U.S. at 791. Specifically, the allegedly libelous article: (1) "concerned the California activities of a California resident"; (2) "impugned the professionalism of an entertainer whose television career was centered in California"; (3) "was drawn from California sources"; and (4) the brunt of the alleged harm was suffered in California. *Id.* at 788–89. In sum, California was the "focal point" of the article and the harm suffered. *Id.* at 789.

Some courts interpret the phrase "arising out of" to require a "but for" analysis, while others interpret it to require a "proximate cause" analysis. *Dudnikov*, 514 F.3d at 1078. Under the former, "any event in the causal chain leading to the plaintiff's injury is sufficiently related to the claim to support the exercise of specific jurisdiction." *Id.* The latter approach is more restrictive. *Id.* It requires that the defendant's contacts with the forum be relevant to the plaintiff's cause of action. *Id.* The Tenth Circuit has applied both tests in prior cases, but it has not had occasion to determine which comports with the due process clause. *Id.* at 1079 ("As between the remaining but-for and proximate causation tests, we have no need to pick sides today."). If, however, a plaintiff satisfies both tests, then the plaintiff's cause of action undoubtedly arises out of the defendant's contacts with the forum state. *Id.*

   c.  *Fair Play and Substantial Justice*

Even if the plaintiff's cause of action arises out of the defendant's contacts with the forum state, courts must determine whether "the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice." *Old Republic*, 877 F.3d at 909 (quoting *Shrader*, 633 F.3d at 1240). But "it is incumbent on defendants to present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* (quoting *Dudnikov*, 514 F.3d at 1080).

**3. Specific Jurisdiction: Mindshare**

At oral argument, the parties expressed uncertainty as to the nature and extent of Mindshare's contacts, if any, with the forum state, Utah. Notably, the parties were unable to answer key questions upon which the jurisdictional analysis turns: (1) whether Mindshare was aware of the contents of the emails at issue, (2) whether Mindshare played a role in drafting and designing the emails at issue, and (3) whether Mindshare knew that DGI LLC used the

10

Mindshare platform to send emails to Utah residents.[9] In short, the parties knew little, if anything, about the service that Mindshare provides.[10] When the court raised these issues with the parties, they conceded that limited discovery as to Mindshare's contacts with Utah is appropriate. Accordingly, the court denies without prejudice the motion to the extent it seeks a ruling as to whether the court has specific jurisdiction over Mindshare.

### 4. Specific Jurisdiction: DGI LLC

DGI LLC contends that the court lacks jurisdiction over it because it did not expressly aim its conduct at Utah. Specifically, DGI LLC argues that it sent emails to Utah residents only when they registered for an xdating.com account. Zoobuh disputes this and argues that the court

---

[9] It appeared that counsel for Zoobuh lacked answers to these questions because he relied on cases that contradict Tenth Circuit precedent. Counsel for Zoobuh urged the court to look towards Ninth Circuit and Utah Supreme Court cases when analyzing specific jurisdiction. For instance, Zoobuh relies on a Utah Supreme Court case to argue that it is irrelevant that Mindshare did not know where the recipients of the emails resided: "[T]he jurisdiction analysis does not 'permit corporations to hide behind the excuse of ignorance in not knowing where . . . they send email[s] . . . .'" ECF No. 33 at 13 (quoting *Fenn v. Mleads Enters., Inc.*, 137 P.3d 706, 714 (Utah 2006)). A compelling argument. But it flies in the face of Tenth Circuit precedent: "if the plaintiff does not show that the defendant otherwise knew where the recipient was located, [an] email itself does not demonstrate purposeful direction of the message to the forum state, even if that happens to be where the recipient lived." *Shrader*, 633 F.3d at 1248; *see also id.* ("[The defendant] sent the email in bulk fashion to multiple recipients (which he never denied); [the evidence] does not indicate that any of the recipients resided in Oklahoma, *much less that [the defendant] knew they resided there when he sent the email*." (emphasis added)); *Dudnikov*, 514 F.3d at 1074 n.9 ("Some courts have held that the 'expressly aimed' portion of *Calder* is satisfied when the defendant 'individually target[s] a known forum resident. We [*i.e.*, the Tenth Circuit] have taken a somewhat more restrictive approach, holding that the forum state itself must be the 'focal point of the tort.'" (citation omitted)). This "restrictive" approach has been criticized. *See, e.g.*, Allan Erbsen, *Personal Jurisdiction Based on the Local Effects of Intentional Misconduct*, 57 Wm. & Mary L. Rev. 385, 427–31 (2015) ("Tortfeasors often know where their victims reside, but there is usually little reason to think that geographic knowledge motivates the tort. Injuries occur in a particular state not because the wrongdoer targeted the state but because victims have to be somewhere, and that is where they happen to be."). But this court must follow Tenth Circuit precedent. *See United States v. Spedalieri*, 910 F.2d 707, 709 n.2 (10th Cir. 1990) ("A district court must follow the precedent of this circuit, regardless of its views concerning the advantages of the precedent of our sister circuits.").

[10] Counsel for Zoobuh speculated as to Mindshare's business operations, but counsel's guess as to what Mindshare does finds little, if any, support in the record.

has jurisdiction over DGI LLC because a number of the emails at issue specifically target Utahans by claiming that other Utahans were using xdating.com. The court agrees with Zoobuh.

a. *Purposeful Direction: DGI LLC*

DGI LLC purposefully directed its conduct at Utah if: (1) DGI LLC committed an intentional act, (2) the intentional act was expressly aimed at Utah, and (3) DGI LLC knew that the brunt of the injury would be felt in Utah. *See Old Republic*, 877 F.3d at 907. Zoobuh has made a prima facie showing as to each element.

*First*, Zoobuh has established that DGI LLC committed an intentional act. It is undisputed that DGI LLC used Mindshare's email platform to send emails to email addresses that were associated with the xdating.com customer list. Baekel Decl. ¶ 10. DGI LLC contends that the email addresses were on the customer list because the owners of the email addresses had registered for accounts on xdating.com. *Id.* But Zoobuh disputes this with an affidavit from its CEO in which the CEO states that the recipients of the emails did not register for accounts on xdating.com. Fullmer Decl. ¶¶ 19–20. Rather, the Zoobuh customers who were on the xdating.com customer list had unsuccessfully attempted to unsubscribe from xdating.com marketing emails. *Id.* Because the parties have submitted competing affidavits, the court resolves this factual dispute in favor of Zoobuh. *See Kennedy*, 919 F.2d at 128.[11] Thus, Zoobuh has made a prima facie showing that DGI LLC committed an intentional act: DGI LLC used Mindshare's email platform to send emails to email addresses associated with the xdating.com customer list.

*Second*, Zoobuh has established that a number of DGI LLC's emails expressly targeted Utah. Specifically, DGI LLC sent emails to Utahans, using Mindshare's platform, and the emails

---

[11] Even if the recipients of the emails registered for accounts on xdating.com, as DGI LLC claims, the court is not convinced that this would change the jurisdictional analysis. DGI LLC still would have sent thousands of emails to Utah residents, and the emails were tailored to convince Utah residents to continue using xdating.com's services.

purport to identify other Utahans that were using xadting.com. For instance, some of the emails state, "Hey there [username], these are few [sic] members we've selected for you near Salt Lake City." ECF No. 33-1 at 47. The emails identify "members" of xdating.com living in a number of cities in Utah, including Ogden, Sandy, West Jordan, Cedar Valley, West Valley City, Provo, Midvale, Spanish Form, Orem, and Murray. *Id.* at 42–83. DGI LLC was responsible, at least in part, for the content of these emails. Ludgey Decl. ¶ 7. Consequently, Zoobuh has made a prima facie showing that DGI LLC "directed its message at an audience in [Utah]." *Shrader*, 633 F.3d at 1241; *cf. id.* at 1245–46 (holding that there was no basis to conclude that the defendant purposefully directed an online post at the forum state based on the "geographically-neutral content of the message").

*Third*, Zoobuh has established that DGI LLC knew that the brunt of the injury would be felt in Utah. DGI LLC directed emails at Utahans, and DGI LLC personalized the emails so that the recipients would believe that there were other Utahans using xdating.com. *See Melaleuca, Inc. v. Hansen*, No. CV07-212-E-EJL, 2008 WL 2788470, at *4–5 (D. Idaho July 18, 2008) (holding that defendant purposefully directed emails at the forum state, Idaho, because defendant sent over 100 emails to people who the defendant knew lived in Idaho). The emails in question allegedly violated CAN-SPAM because they contained misleading information. Viewing the facts in the light most favorable to Zoobuh, DGI LLC knew that the brunt of the injury would be felt in Utah because it targeted Utahans with emails that were deliberately misleading. Put another way, Utah was the focal point of both the emails and the harm suffered because the emails were tailored to mislead Utahans into believing that other Utahans were using xdating.com. *See Calder*, 465 U.S. at 788–89 (holding that California was the focal point of an allegedly libelous article because, among other reasons, the article focused on California's

13

television industry and the subject of the article—an actress—suffered emotional distress and injury in California).

### b. *Arising Out Of: DGI LLC*

Zoobuh has made a prima facie showing that its claims under CAN-SPAM arise out of DGI LLC's contacts with Utah. *First*, Zoobuh has satisfied the "but for" test because its claims would not have arisen but for DGI LLC sending the emails in question. If DGI LLC did not send emails to Utah residents, Zoobuh would have no case. *Second*, Zoobuh has satisfied the more demanding "proximate cause" test because DGI LLC's contacts with Utah—misleading emails—are relevant to Zoobuh's claims. Indeed, Zoobuh's claims are based on the content of the emails at issue—the emails themselves give rise to Zoobuh's claims. *See* 15 U.S.C. § 7704(a)(1) ("It is unlawful for any person to initiate the transmission, to a protected computer, of a commercial electronic mail message . . . that contains, or is accompanied by, header information that is materially false or materially misleading."). In sum, Zoobuh has satisfied both the "but for" and "proximate cause" tests and therefore has made a prima facie showing that its claims arise out of DGI LLC's contacts with Utah. *See Dudnikov*, 514 F.3d at 1079 (applying both the "but for" and "proximate cause" tests to conclude that the plaintiff's claim arose out of the defendant's contacts with the forum state).

### c. *Fair Play and Substantial Justice: DGI LLC*

As noted above, once the first two requirements are established, the court may exercise jurisdiction over the defendant unless the defendant presents a "compelling case" that the presence of some other consideration renders jurisdiction unreasonable. *Old Republic*, 877 F.3d at 908–09. The following factors are relevant: "(1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient

resolution of controversies, and (5) the shared interest of the several states in furthering fundamental social policies." *Id.* at 909 (quoting *Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1279–80 (10th Cir. 2005)).

The first factor—the burden on the defendant—speaks to why it would be unfair or unjust to exercise jurisdiction over a defendant. The remaining factors speak to reasons why the court, even when the exercise of jurisdiction imposes a burden on the defendant, should nevertheless do so. Here, DGI LLC has not shown that the first factor weighs in its favor, and therefore the court need not address the remaining factors.

*First*, DGI LLC argues that forcing it to litigate in Utah is burdensome because potential witnesses reside in California and Delaware. But DGI LLC offers no evidence to support this argument. And it offers no explanation, conclusory or otherwise, as to the extent of this burden. Consequently, the court is not convinced that DGI LLC will suffer a burden if witnesses must travel to Utah. *Cf. Emp'r Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1169 (10th Cir. 2010) ("To demonstrate inconvenience, the movant must (1) identify the witness and their locations; (2) 'indicate the quality or materiality of the[ir] testimony'; and (3) 'show[] that any such witnesses were unwilling to come to trial . . . .'" (citation omitted)).

*Second*, DGI LLC argues that it will be burdened because "[t]he evidence is located in California and Delaware." But this argument is, at best, a red herring. DGI LLC does not explain what "the evidence" is. And DGI LLC does not explain why it is more burdensome to present "the evidence" to a court in Utah, as opposed to ones in California, Delaware, or any other state for that matter. The nature of the case suggests that "the evidence" will consist mostly of emails, which can be transferred easily from California or Delaware to Utah. And Zoobuh has represented that all of the emails at issue are located on its servers in Utah. Consequently, the

court is not persuaded that the location of "the evidence" imposes any burden on DGI LLC, especially when DGI LLC has not identified "the evidence."

*Third*, DGI LLC contends that the exercise of jurisdiction over it is burdensome because it derives 1 percent of its revenue from Utah. But DGI LLC does not offer any evidence as to its annual revenue. If DGI LLC's annual revenue is significant (*e.g.*, millions of dollars), the fact that it derives one percent of its revenue from Utah might actually support the exercise of jurisdiction over it. Indeed, many corporations might derive less than 1 percent of their revenue from Utah. But that 1 percent may represent a significant dollar amount. Consequently, the fact that DGI LLC derives 1 percent of its revenue from Utah does not suggest that the exercise of jurisdiction over DGI LLC is unreasonable. If anything, it suggests the opposite.

In sum, DGI LLC has not shown that it will be burdened if it is haled into a Utah court. DGI LLC offers no evidence to support its vague and conclusory arguments. And to present a compelling case against the exercise of jurisdiction, DGI LLC needed to show that being forced to litigate in Utah is "so gravely difficult and inconvenient" that it is at a "severe disadvantage." *Burger King*, 471 U.S. at 478 (citation omitted). DGI comes nowhere near such a showing.

*   *   *

DGI LLC intentionally sent emails to Utahan. The emails targeted Utah because they purported to identify Utahans who were members of xdating.com. Zoobuh's suit arises from and seeks redress based on these emails. Viewing the facts in the light most favorable to Zoobuh, DGI LLC knew that the emails at issue would cause injury in Utah based on the fact that the emails were intended to mislead Utahans to believe that other Utahans were using xdating.com. Finally, DGI LLC has not presented a compelling case that the exercise of jurisdiction over it is unreasonable. Consequently, the court concludes that it has personal jurisdiction over DGI LLC.

*See Williams*, 2014 WL 7261786, at *5 (stating, albeit in dicta, that the court would likely have jurisdiction over publishers who used a marketing company to send emails to Utah residents).

## B.  FAILURE TO STATE A CLAIM: RULE 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim upon which relief cannot be granted. The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties may present at trial but to assess whether a party's allegations are legally sufficient to state a claim upon which relief can be granted. *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). This standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Where the allegations are merely "label and conclusions" or a "formulaic recitation of the elements of a cause of action," the plaintiff's claim will not survive a motion to dismiss. *Twombly*, 550 U.S. at 555. For the claim to survive, the plaintiff's allegations "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Plausibility, in this context, means that the plaintiff has alleged facts that allow "the court to draw [a] reasonable inference that the defendant is liable for the alleged misconduct." *Id.* Factual allegations that are "'merely consistent with' a defendant's liability," however, do not give rise to a plausible claim to relief. *Id.* (quoting *Twombly*, 550 U.S. at 557).

When a plaintiff's claim involves fraud, the plaintiff must satisfy Rule 9(b)'s heightened pleading standard. Fed. R. Civ. P. 9(b); *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1254 (10th Cir. 2016). Under Rule 9(b), a plaintiff must "state with particularity the circumstances

constituting fraud." The Tenth Circuit has interpreted this rule to require the plaintiff to "set forth the time, place and contents of the false representations, the identity of the party making the false statements and the consequences thereof." *George*, 833 F.3d at 1254 (quoting *Koch v. Koch Indus.*, 203 F.3d 1202, 1236 (10th Cir. 2000)). The purpose of this is to afford the defendant fair notice of the plaintiff's claims and the factual basis for the claims. *Id.* at 1255.

### 1. Mindshare's Remaining Arguments

Mindshare has moved to dismiss all of the claims against it under Rule 12(b)(6). Mindshare contends, among other things, that Zoobuh has not sufficiently alleged that Mindshare initiated or procured the emails at issue, as is required under CAN-SPAM. As discussed above, however, the parties must engage in limited discovery to ascertain whether the court has jurisdiction over Mindshare. It would be premature to address Mindshare's arguments as to the sufficiency of Zoobuh's claims when the court may lack jurisdiction over Mindshare. Accordingly, Mindshare's motion is denied without prejudice to the extent that it requests a ruling on the sufficiency of Zoobuh's claims, except as detailed below with respect to Zoobuh's second cause of action.

### 2. Zoobuh's Second Cause of Action

Zoobuh, under its second cause of action, alleges that Defendants violated 15 U.S.C. § 7704(a)(1). Zoobuh alleges that Mindshare registered a domain name with Network Solutions. First Am. Compl. ¶ 78. Network Solutions is an Internet Corporation for Assigned Names and Numbers ("ICANN") compliant domain registrar. *Id.* ¶ 76. Mindshare agreed to an anti-spam policy when it registered domain names with Network Solutions. *See id.* ¶¶ 76–78. Zoobuh alleges that each of the 73,030 emails at issue constitute a violation of CAN-SPAM because they were sent in violation of Network Solutions' anti-spam policy. *Id.* ¶¶ 80, 88.

DGI LLC and Mindshare move to dismiss the second cause of action on the grounds that it fails to state a violation of CAN-SPAM. Specifically, they contend that a mere violation of an anti-spam policy does not, by itself, constitute a violation of CAN-SPAM. In response, Zoobuh relies on *Zoobuh, Inc. v. Better Broadcasting*, No. 2:11-cv-00516-DN, 2013 WL 2407669 (D. Utah May 31, 2013), to argue that it has stated a violation of CAN-SPAM by alleging: (1) that DGI LLC and Mindshare registered a domain name with an ICANN compliant domain registrar, Network Solutions, (2) that Network Solutions had an anti-spam policy, and (3) that DGI LLC and Mindshare sent emails in violation of the policy. Zoobuh, however, misreads § 7704(a)(1)(A) and *Better Broadcasting*.

Section 7704(a)(1) provides that it is "unlawful for any person to initiate the transmission, to a protected computer, of a commercial electronic mail message . . . that contains, or is accompanied by, header information that is materially false or misleading." Under subparagraph (A), header information is materially misleading if it "is technically accurate but includes an originating electronic mail address, domain name, or Internet Protocol address the access to which for purposes of initiating the message was obtained by means of false or fraudulent pretenses or representations." § 7704(a)(1)(A). Thus, applying the language in subparagraph (A), a person violates § 7704(a)(1) when they: (1) initiate the transmission of an email, (2) to a protected computer, and (3) the domain name from which the email is sent was "obtained by means of false or fraudulent pretenses or representations."

Here, Zoobuh fails to allege sufficient facts to establish the third element: Zoobuh's allegations do not plausibly establish that DGI LLC and Mindshare obtained the m100.net domain name "by means of false or fraudulent pretenses or representations." At most, Zoobuh alleges in a conclusory fashion that "Mindshare registered the m100.net domain for the sole

purpose of using it within its platform to send bulk email, which is a direct violation of the Network Solutions policy." First Am. Compl. ¶ 79.[12] But this is merely a formulaic recitation of a required element: Mindshare obtained the domain name by means of a false statement (*i.e.*, that it would comply with Network Solutions' policy). And the court therefore disregards it. *See Iqbal*, 556 U.S. at 679–80 (noting that the Court, in *Twombly*, implicitly held that plaintiff's assertion of an "unlawful agreement" was a legal conclusion not entitled to an assumption of truth). Nowhere else in its complaint does Zoobuh allege that Mindshare (or DGI LLC) made a false statement to Network Solutions. Consequently, Zoobuh has not sufficiently alleged that Mindshare and DGI LLC obtained the m100.net domain name by means of false or fraudulent pretenses or representations.

Zoobuh reads § 7704(a)(1)(A) to impose liability on any company that sends email in violation of an anti-spam policy, and its allegations reflect this. But Zoobuh's reading of § 7704(a)(1)(A) is erroneous. Header information is not materially misleading simply because an email is sent in violation of an anti-spam policy. Rather, header information is "materially misleading" if the domain name from which an email is sent was obtained by "false or fraudulent pretenses or representations." § 7704(a)(1)(A). Zoobuh's misunderstanding of § 7704(a)(1)(A) is reflected in its allegations: "each of the . . . emails violates . . . CAN-SPAM because each [email] violates Network Solutions' anti-spam policy." First Am. Compl. ¶ 78. Put simply, Zoobuh alleges a breach of an agreement (*i.e.*, the anti-spam policy) when the plain language of the statute requires fraud (*i.e.*, a false or fraudulent statement used to obtain access to a domain name). *See United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 917 (7th Cir. 2005)

---

[12] Notably, this allegation says nothing about DGI LLC's involvement in obtaining the m100.net domain name.

("[F]ailure to honor one's promise is (just) breach of contract, but making a promise that one *intends* not to keep is fraud.").

*Zoobuh, Inc. v. Better Broadcasting*, the main case on which Zoobuh relies, supports this court's conclusion. There, the court held, in relevant part:

> When a party registers a domain name with an ICANN compliant domain registrar, the registrant enters into a registration agreement with the domain registrar. In most, but not all cases, the domain registration agreement and the accompanying Terms and Conditions (collectively "Registration Documents") prohibit the use of the registered domain to send unsolicited commercial email or engage in other SPAM practices. *Accordingly, in order to obtain the domains from the registrar, the registrant represents that it does not intend to use, and will not use, the domain for any purpose prohibited by the Registration Documents. If, as is the case here, the registrant does intend to use the domains for prohibited purposes, the registrant obtained the domain under false pretenses, and the sending of any email in violation of the Registration Documents violates 15 U.S.C. § 7704(a)(1)(A) on a per email basis.*

*Better Broadcasting*, 2013 WL 2407669, at *6 (emphasis added). In short, the court in *Better Broadcasting*, consistent with this court's reasoning, looked to whether the defendant knowingly made false statements when it registered a domain name. *Id.* The court did not hold that the mere violation of an anti-spam policy satisfies § 7704(a)(1)(A).[13]

Finally, Zoobuh has not met the heightened pleading standard of Rule 9(b). To establish a claim based on § 7704(a)(1)(A), Zoobuh must show that the domain name from which emails were sent was "obtained by means of false or fraudulent pretenses or representations." Zoobuh must therefore state with particularity the circumstance constituting fraud: it must set forth the time, place, and contents of the false representations, the identity of the party making the false

---

[13] The court is also skeptical as to the persuasiveness of *Zoobuh, Inc. v. Better Broadcasting*, a case in which the court granted an *unopposed* motion for default judgment. The *Better Broadcasting* court did not have the benefit of adversarial briefing. Indeed, it appears that the *Better Broadcasting* court, perhaps understandably, relied heavily on Zoobuh's briefing of the issues. Counsel for Zoobuh conveniently omits this information in his filing—which is curious, considering he was counsel of record in *Better Broadcasting*.

statements and the consequences thereof. As noted above, Zoobuh has erroneously read the false or fraudulent statement requirement out of § 7704(a)(1)(A), and thus its allegations are woefully inadequate. At most, Zoobuh has identified the contents of false statements made by Mindshare. *See* First Am. Compl. ¶ 78. But alleging false statements alone does not satisfy Rule 9(b)'s heightened pleading standard. Accordingly, the court concludes that Zoobuh second cause of action fails because Zoobuh has not stated with particularity the circumstances constituting fraud.

In sum, Zoobuh's second cause of action fails to state a claim upon which relief can be granted. At most, Zoobuh alleges facts showing that Mindshare (and perhaps DGI LLC) violated an anti-spam policy. But Zoobuh has not sufficiently alleged that the domain name from which the emails were sent was "obtained by means of false or fraudulent pretenses or representations." Moreover, Zoobuh has not alleged with particularity the circumstances constituting fraud. Accordingly, Zoobuh's second cause of action is dismissed without prejudice as to all defendants.[14]

### 3. Zoobuh's Fifth Cause of Action

Zoobuh's fifth cause of action alleges that Sylvia van Baekel is liable under CAN-SPAM because she is "the exclusive control person of DGI and an initiator under . . . [CAN-SPAM]." *Id.* ¶ 104. Problematically, under the fifth cause of action, Zoobuh alleges that "*XMission* prays for relief against Baekel personally for each of the violations of [CAN-SPAM] . . . ." *Id.* ¶ 105 (emphasis added). XMission is not a party to the suit, and the allegations do not establish that XMission is entitled to any type of relief. In fact, XMission is mentioned only once in the first amended complaint—in the prayer for relief under Zoobuh's fifth cause of action. As such,

---

[14] Zoobuh, in its amended complaint, did not clarify against whom it asserts this cause of action. As such, the court reads Zoobuh's amended complaint as asserting it against all defendants.

Zoobuh's fifth cause of action fails to state a claim upon which relief can be granted, and the court therefore dismisses it without prejudice. Zoobuh, at its option, has seven days from the day of this order to amend its complaint to change "XMission" to "Zoobuh."[15]

## IV. CONCLUSION AND ORDER

For the reasons set forth above, IT IS HEREBY ORDERED:

1. Defendants' Motion to Dismiss (ECF No. 28) is GRANTED IN PART and DENIED IN PART;

2. Zoobuh has sixty (60) days from the date of this order to engage in limited discovery concerning Mindshare's contacts with the forum state, Utah;

3. Defendants' motion to dismiss is DENIED WITHOUT PREJUDICE to the extent that Mindshare requests a ruling on (1) personal jurisdiction and (2) the sufficiency of Zoobuh's first, third, and fourth causes of action;

4. Mindshare may, at its option, re-raise the arguments raised in its motion to dismiss after the parties have engaged in limited discovery concerning Mindshare's contacts with Utah;

5. Zoobuh's second cause of action is DISMISSED WITHOUT PREJUDICE;

6. Zoobuh's fifth cause of action is DISMISSED WITHOUT PREJUDICE; and

7. Zoobuh has seven days from the date of this order to amend its complaint to change "XMission" to "Zoobuh" under its fifth cause of action.

//

//

//

---

[15] The court recommends that counsel for Zoobuh proofread his filings in the future, especially when copy-pasting language from documents used by other parties in other cases.

Signed June 8, 2018

BY THE COURT

Jill N. Parrish
United States District Court Judge