1                   IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

3

4

   XMISSION, a Utah company,      )
5                                 )
            Plaintiff,            )
6                                 )
       vs.                        )
7                                 )
   9 FOUR ONE MEDIA, et al.,      )   Case No:   2:18cv182
8                                 )
            Defendant,            )
9   _____      )
                                  )
10                                )

11

12

13

14

15

16

                      BEFORE THE HONORABLE ROBERT J. SHELBY
17

                          August 30, 2018
18

                          MOTION HEARING
19

20

21

22

                          Reported by:
23               KELLY BROWN HICKEN, RPR, RMR
                      801-521-7238
24

25

```
 1                        APPEARANCES OF COUNSEL

 2     FOR THE PLAINTIFF:       DURHAM JONES PINEGAR PC

 3                              BY:  JORDAN K. CAMERON

 4                                   Attorney at Law

 5                              3301 N THANKSGIVING WY, STE 400

 6                              LEHI, UT  84043

 7

 8     FOR DEFENDANT FLUENT:    NEWMAN DU WORS LLP

 9                              BY:  DEREK A. NEWMAN

10                                   Attorney at Law

11                              100 WILSHIRE BLVD STE 700

12                              SANTA MONICA, CA 90401

13

14                              SNOW CHRISTENSEN & MARTINEAU

15                              BY:  R. SCOTT YOUNG

16                                   Attorney at Law

17                              PO BOX 45000

18                              SALT LAKE CITY, UTAH  84145-5000

19

20

21

22

23

24

25
```

1         SALT LAKE CITY, UTAH, THURSDAY, AUGUST 30, 2018

2                         *   *   *   *   *

3            THE COURT:  Good afternoon, everyone.  We'll call

4    Case Number 2:18-CV-182.  It's XMission vs. 9 Four One Media

13:35:34   5    and others.  Counsel, many of you are familiar to me, but why

6    don't we take a moment and make appearances, should we?

7            MR. NEWMAN:  Good afternoon, Your Honor.  My name

8    is Derek Newman.  I represent the defendant Fluent.  I'm

9    joined by my co-counsel Scott Young and the vice-president and

13:35:53   10   general counsel of Fluent, Mr. Dan Barsky.

11           THE COURT:  Thank you.  Welcome to all of you.

12           MR CAMERON:  Good morning, Your Honor.  Jordan

13   Cameron.  I represent the plaintiff XMission in this matter.

14           THE COURT:  Perfect.  Thank you.  This is the time

13:36:06   15   set for oral argument on Fluent's motion to dismiss for lack

16   of personal jurisdiction.  As is always the case, I've read

17   everything that you've all submitted and have familiarized

18   myself with the legal authorities.  And I'm prepared -- I've

19   come to the bench with an initial orientation about the issues

13:36:31   20   and the outcome.  In fact, I've prepared a draft or a ruling,

21   and we'll see.  You may all persuade me that what I think I

22   know about the case or how I think the law applies is wrong in

23   which case we'll turn in another direction.

24           But, Mr. Cameron, in reviewing the motion it seems

13:36:50   25   well taken to me.  And there's a lot of things that we can

1    talk about and I assume we'll talk about today.  I know that

2    neither of these cases is controlling on me or binding on me,

3    but it seems this is the third of sort of some related cases

4    in the district, at least the third.  We have Judge Stewart's

13:37:09   5    written decision and Judge Parrish's written decision.  And I

6    suppose my first question is, are those cases both correctly

7    decided?  And my second question is, if they are, isn't this

8    Judge Stewart's case and not Judge Parrish's case?  Which is

9    shorthand for the analysis that they both apply.

13:37:28   10          But the long and short of it is I'm pretty

11   persuaded by Judge Stewart's application of facts that seem

12   very aligned with the facts in our case.  And it seems like

13   the same outcome would yield here.  But you see it differently

14   maybe.

13:37:45   15          Let me invite you to come up to the podium, if

16   you'd like.  And not to beat a dead horse, either, and not to

17   embarrass anyone, I think if judges don't talk about these

18   issues then they just continue on in perpetuity.  I read the

19   language of Judge Parrish's decision, and I had a similar

13:38:12   20   concern that she raised in her opinion about the plaintiff

21   advancing a general jurisdiction argument here.

22          And, Mr. Cameron, there's no basis, is there, in

23   law or fact for contending that XMission is subject to general

24   jurisdiction in the state of Utah?

13:38:31   25          MR CAMERON:  Your Honor, I don't know that we have

1    enough information on Fluent's business dealings in the state

2    of Utah to really opine on that at this point.

3              THE COURT:  Haven't you, though?  You have opined

4    on that.  And you told me and you told Judge Parrish that they

13:38:45 5    have submitted to general jurisdiction.  Are you familiar with

6    the legal standards that govern that analysis under the

7    Supreme Court case law in the last few years?

8              MR CAMERON:  I am, Your Honor.

9              THE COURT:  Is there a legal basis for that

13:38:58 10   argument based on what you know?

11             MR CAMERON:  Your Honor, I would concede that that

12   basis is tenuous under general jurisdiction.  And I think the

13   argument is compelling under specific jurisdiction.

14             THE COURT:  It's not helpful to include in briefs,

13:39:09 15   you know this, of course, and I'm not trying to embarrass you,

16   but I try to make a point of this when it seems it can be

17   helpful.  When you make an argument like that even if it's

18   offhanded, and I think nobody's probably saluted it very much,

19   but it requires the other side to respond.  It requires me to

13:39:26 20   look at it.  It may involve the expenditure of time and

21   resources on an argument that you were never going to advance

22   today.  It's not helpful to have it in the briefs.  It's not

23   helpful to present it unless you're really going to pursue is

24   it, I think, setting aside the professional obligations.  I

13:39:42 25   just mean as a matter of helping us get to the core of the

```
         1    issue we have to resolve.  And that's probably more than we

         2    needed to say about it.

         3           But you'd like to talk about the specific

         4    jurisdiction today.

13:39:53 5           MR. CAMERON:  That's correct, Your Honor.  And I

         6    would like to say I appreciate the commentary, and it's a

         7    point well taken.

         8           THE COURT:  Okay.

         9           MR CAMERON:  So thank you for the instruction on

13:39:59 10   that.

        11           THE COURT:  Thank you.  All right.  Is this

        12   Judge Stewart's case?

        13           MR CAMERON:  It is not Judge Stewart's case.  In

        14   fact, it's drastically different than Judge Stewart's case.

13:40:09 15   And I'd like to illustrate for the Court what Fluent's general

        16   business model looks like, how it involves XMission and how it

        17   involves Utah particularly.

        18           THE COURT:  I'm going to stop you before you get

        19   off the ground.  If you're going to tell me things that you

13:40:20 20   want me to rely today that are outside of the pleadings or the

        21   affidavits or declarations then you're inviting me to rely on

        22   something that's not in the record, and I'm not going to go

        23   beyond the record.

        24           MR. CAMERON:  And, Your Honor, I'm not planning to

13:40:32 25   do so.
```

1          THE COURT:  Okay.

2          MR CAMERON:  All of what I prepared is based off

3     the declaration of Mr. Barsky and the other evidence that's

4     been submitted to the Court.

13:40:38  5          THE COURT:  Perfect.  Thank you.

6          MR CAMERON:  Including Fluent's web pages and the

7     additional evidence we submitted regarding their financial

8     information.

9          I printed binders, Your Honor.  I don't know if you

13:40:49 10   prefer paper copies or I can display it on your screen.

11    Whatever is easiest for you.

12         THE COURT:  Whatever you prefer.

13         MR CAMERON:  Okay.

14         Can you turn on this monitor, please?

13:41:01 15        THE CLERK:  Yes.

16         MR CAMERON:  Between Fluent's declaration of

17    Mr. Barsky and its website it identifies its essential

18    business model, which is to create what it calls immersive

19    experiences that are then disseminated into commerce with the

13:41:28 20   purpose of gathering, collecting consumer information Fluent

21    themselves for money.

22         The first stage of that process which Fluent admits

23    is that it creates these, quote-unquote, immersive

24    experiences.  After that Fluent indicates that it contracts

13:41:44 25   and pays commissions to publishers to disseminate these

1          immersive experiences into commerce.  These unlike in the

2          Ted Stewart case are not purely advertisement.

3                    THE COURT:  Do we know that they contract?  Did I

4          see that?

13:41:59  5                    MR CAMERON:  Yes.  They've admitted that.

6                    THE COURT:  Okay.

7                    MR CAMERON:  And, in fact, though they don't say it

8          in their declaration, we have presented evidence to the Court

9          which I can show, that Fluent does contract with publishers in

13:42:12  10         Utah to disseminate these.  Now it's interesting that that

11         information is not present in Mr. Barsky's declaration, and I

12         think it's telling.  Mr. Barsky goes through a laundry list of

13         contacts or lack of contacts with the state of Utah.  But he

14         omits the very fundamental contact that pertains specifically

13:42:32  15         to their business model that I believe it was intentional.

16         And I think the reason it's not included in the declaration is

17         because if it were included it would not be favorable to

18         Fluent's position.

19                    For example, while Fluent admits that it

13:42:42  20         disseminates immersive experiences and that it contracts with

21         publishers to do so, it does not tell us how many publishers

22         in Utah it relies on for that purpose.  However, what we know

23         based off the information that we've discovered and that we've

24         submitted to the Court is that at least some of the e-mails in

13:43:03  25         question, a number of them, came from a publisher in Utah.

1          We've submitted record evidence to the Court

2     identifying the address of this publisher which we based down

3     based off the servers that we use to publish the e-mails as

4     existing in Herriman, Utah.  There's evidence that Fluent

13:43:25  5     contracts with publishers to disseminate this contact.

6          THE COURT:  I'm so sorry.  I really thought I read

7     everything that was submitted including at least three

8     supplemental briefs, I thought four.  I've read four

9     supplemental submissions after the briefing, and I don't

13:43:43 10     believe I've seen that.

11          MR CAMERON:  I can point you to the exhibit, Your

12     Honor.

13          THE COURT:  Would you kindly?

14          MR CAMERON:  Yes.  And for one reason or another

13:43:49 15     the Bates number is not showing up on that document.  Let me

16     get it.

17          THE COURT:  Is this attached as an exhibit to the

18     opposition memorandum?

19          MR. CAMERON:  Yes.  To the declaration of

13:44:00 20     Mr. Peter Ashdown.  It's under P0073, which is the

21     documentation submitted in support of or is part of

22     Mr. Ashdown's declaration.

23          MR. SHELBY:  I ask for your patience.  I'm sorry.

24     Judge Nuffer and I are now sharing a courtroom, and this is

13:44:45 25     the very first time we've had his computer up here instead of

1    mine.  This is going to take just a minute.  I have

2    Mr. Ashdown's declaration with me.  I don't have all of the

3    exhibits with me today.

4              And you're talking now about the information that's

13:45:45  5  set forth in Paragraph 22 of Mr. Ashdown's declaration; is

6    that right?

7              MR CAMERON:  Let me take a look at that, Your

8    Honor, and just see to verify.

9              Yes.  Paragraph 20 it begins:  Not only are the

13:46:19  10  recipients of the e-mails located in Utah, the actual e-mail

11    addresses --

12              THE COURT:  You need to slow down.

13              MR CAMERON:  Yes.  I apologize.

14              Not only are the recipients of the e-mails located

13:46:28  15  in Utah, the actual e-mail addresses identify the location of

16    the recipients, and there could be no mistake about where

17    these e-mails are being sent.  Also, the WHOIS registration

18    information for the domains identifies -- excuse me.  That's

19    not the right part.  That's referring to the recipient

13:46:41  20  information.  Let me tell you the -- I'll get to the right

21    part, Your Honor.

22              Oh, it's just Paragraph 22.  Is that what you

23    pointed me to, Your Honor?  I apologize.

24              THE COURT:  It's all right.

13:47:06  25              MR CAMERON:  Some of Fluent's e-mails appear to

1    have actually been sent to XMission from within the state of

2    Utah from the sender domain.

3              THE COURT:  You're really flying.  I'm so sorry.

4    You're going to kill our court reporter.

13:47:18  5              MR CAMERON:  I apologize, Your Honor.

6              Some of Fluent's e-mails appear to have actually

7    been sent to XMission from within the state of Utah from the

8    sender domain solitaryworld.net.

9              And then we provided the evidence of that

13:47:32 10   identifying the location of this domain, which is a server

11   domain that was used to transmit some of these Fluent e-mails

12   to XMission.

13             THE COURT:  I'm not going to have any luck breaking

14   into Judge Nuffer's super secret file system.  So I have the

13:47:52 15   declaration in front of me.  If there are specific exhibits to

16   the declaration that you would like me to see and rely on, I

17   haven't seen them.  I'd like to see them.  I'd like to view

18   them either electronically or in person.

19             MR CAMERON:  And I will present those to Your Honor

13:48:06 20   as I pull them up.

21             THE COURT:  Thank you.  All right.  Go ahead.

22             MR CAMERON:  This is an important element to this

23   puzzle, because we have an admission from Fluent that it pays

24   commissions to publishers to send its e-mails.  What they

13:48:19 25   don't tell us is the number of publishers they have in Utah,

1     but there is evidence that they do have some of these

2     publishers in Utah.  I believe had they indicated for the

3     Court the number of publishers they have in Utah that that

4     would have been unfavorable, and that's the reason they've

13:48:31  5     omitted that information.

6          It's important also for the Court to recognize and

7     understand what these immersive experiences are.  Unlike in

8     Stewart's decision which dealt purely with advertisements

9     being disseminated through e-mail and frankly not even

13:48:50  10    advertisements for the company that was the defendant in that

11    case but advertisements for third parties, the immersive

12    experiences were created by Fluent to be used by Fluent to

13    gather information from consumers so that Fluent can then take

14    that information and use it and proffer from it.

13:49:06  15         The immersive experiences begin with an e-mail as

16    the first step.  And we've submitted this to the Court, as

17    well, as exhibits to Mr. Ashdown's declaration.  This

18    particular e-mail, for example, identifies as if it were from

19    Chick-Fil-A.  Of course, it wasn't from Chick-Fil-A.  And, in

13:49:33  20    fact, it doesn't advertise.  Your Honor, I'm just going to --

21    could I bring this up to you?

22              THE COURT:  Thank you.

23              MR CAMERON:  And this is Exhibit 2 in your book.

24              THE CLERK:  Thank you.

13:49:45  25              THE COURT:  Thank you.  And I've seen this e-mail.

12

1    Thank you.

2              MR CAMERON:  I've got a copy for your clerk, as

3    well.

4              THE LAW CLERK:  Thank you.

13:50:01  5    MR CAMERON:  Importantly this e-mail is embedded

6    with what we call a redirect link, Hyperlink, which transmits

7    the recipient of that e-mail when they click on the promoted

8    offered to restaurantpromotionsusa.com, which is a website

9    that is owned and operated by Fluent.

13:50:26  10             Restaurant Promotions is then designed as this, the

11   completion of this immersive experience.  Of course, the first

12   stage of the immersive experience is the e-mail itself, and

13   this is the followup, as gathering personalized information

14   from consumers so that Fluent can then aggregate that and

13:50:43  15   create value out of that when it sells it to advertisers.  It

16   asks for age --

17             THE COURT:  Everything you've said so far at least

18   at this stage is not disputed, I don't think.  I understand

19   all of this from the submissions, and Fluent's not saying

13:50:57  20   otherwise.  I mean, they may when we reach the merits.  But

21   maybe you're getting here.

22             Let's say this is all bad stuff and I understand

23   the business model.  How has Fluent deliberately and

24   intentionally availed itself to the state of Utah?

13:51:12  25             MR CAMERON:  That's an excellent point, Your Honor.

1    And I do plan to tie up those loose ends.  And I appreciate

2    that you've seen this so I don't have to show you the full

3    immersive experience.  But I think the one thing the Court

4    needs to make note of is the fact that Fluent and not the

5    publishers who they pay to transmit these e-mails are the ones

6    who are entering into and intending to enter into the

7    contractual relationships with Utah citizens that are offered

8    through their immersive experiences.

9            The immersive experiences start with an offer.

10   It's an invitation of contract.  Fluent intentionally

11   disseminates those across the United States.  In doing so,

12   they arrive, and Fluent can anticipate that they arrive in

13   Utah, they do arrive in Utah.  And through the immersive

14   experiences Fluent, not the publishers, is the party who makes

15   the offer of contract to the Utah citizens.

16           In the case of this example that I'm showing at the

17   outset, the offer is a free delicious sandwich from

18   Chick-Fil-A.  Of course that's the offer on the face of the

19   e-mail.  Once you get into the immersive experience it's

20   different.  Nevertheless, it's Fluent's obligation that's

21   being created through this e-mail.

22           That did not exist in Stewart's decision in the

23   other case.  There was no offer of contract.  There was no

24   invitation to a Utah consumer to enter into an agreement with

25   Fluent.

14

1           And the way that agreement works, Your Honor, if I

2      can get back to my diagram, and I've talked about this a

3      little bit, but the publishers disseminate those including in

4      this case at least 10,141 immersive experiences transmitted

13:52:55  5      into Utah to over 1100 Utah citizens, they were transmitted

6      through XMission's e-mail servers.  Every single one of those

7      10,141 transmissions is an offer to contract advanced by

8      Fluent through XMission servers in Utah to citizens in Utah.

9      They are attempting to do business through these immersive

13:53:15  10      experiences.  They intend to do business through these

11      immersive experiences.

12           The immersive experience e-mails promise a reward,

13      and they provide the link to Fluent's website, which is not in

14      dispute, as Your Honor correctly states.  The immersive

13:53:30  15      experiences then are used to gather consumer data including

16      Utah consumers in exchange for the promise reward.

17           Notably absent from Fluent's declaration is the

18      number of Utah citizens from whom they've gathered this data.

19      They admit that they do it, but they don't admit the number of

13:53:48  20      Utah citizens from whom they gathered information.  I think

21      that's telling.  I think had they admitted that it would have

22      been a negative fact for them.

23           Additionally, into honoring their contracts

24      assuming that Fluent does honor their contracts, they would

13:54:05  25      then be obligated to pay the reward including to the consumers

1    in Utah who can lead the immersive experiences.  That requires

2    an affirmative act by Fluent to transmit the reward into Utah.

3    Whether it's a gift card, whether it's an iPad or whatever it

4    may be, it requires a completion of a transaction in Utah.

13:54:22  5         Also notably absent from Fluent's declaration among

6    the laundry list of contact they don't have in Utah is the

7    statement that they don't send rewards into Utah because, in

8    fact, they do.  We don't know to what extent, but we can

9    assume that the number is significant based off the sure

13:54:37 10   amount of transactions that they boast that they in turn to on

11   daily basis, which exceeds 1 million based off their website

12   data.  After Fluent has gathered that information it then

13   sales the data gathered from immersive experiences including

14   those transacted in Utah to advertisers and generates

13:54:56 15   .9 percent of its income.

16        Now this is important for the Court to understand.

17   There are very many contacts that Fluent has with Utah

18   throughout this entire process, the first of which is with its

19   publishers.  We don't know the number of publishers they have

13:55:11 20   in Utah.  They didn't tell is that.  But we know there is

21   evidence of at least one that sent a number of e-mails in this

22   case.  That's the primary contact with Utah.

23        After that the publishers disseminate those e-mails

24   which are offers to contract from Fluent that Fluent must

13:55:27 25   honor into Utah.  It's extending offers of business to Utah

1    consumers, and in this case to over 1100 Utah consumers.

2    Thereafter, it's obligated under their own contracts, under

3    their own terms which we've submitted to the Court to honor

4    those contracts and provide rewards to people in Utah.

13:55:46  5            THE COURT:  What evidence is there in the

6    record -- well, let me pause for a moment.  What do you

7    think -- let me step back even a step before that.  I believe,

8    I believe that you mis-cited the law, the legal standard in

9    part in your opposition memorandum when you urged the Court to

13:56:10 10   resolve factual disputes in your favor.  Let me articulate

11   what I think the legal standard is that I'm required to apply.

12            MR. CAMERON:  Please do.

13            THE COURT:  And you tell me if you think we have it

14   right.  And then let's talk about what you think the factual

13:56:23 15   record is.

16            I think at this stage of the proceedings the

17   well-pled allegations of the complaint are assumed to be true.

18   And that's true with respect to jurisdictional allegations,

19   also, until or unless a defendant comes forward with competent

13:56:42 20   evidence, sworn affidavits or declarations relating to

21   jurisdictional issues, in which case those are assumed to be

22   true and correct unless or until the plaintiff responds with

23   additional evidence, affidavits or declarations.  And if there

24   become factual disputes between the evidentiary submissions of

13:57:08 25   the parties, those are resolved in the plaintiff's favor.  I

1    think that's how the facts work.

2           MR CAMERON:  I agree, Your Honor.

3           THE COURT:  And in so far that there are facts in

4    the complaint that relate to jurisdiction and those aren't

13:57:21  5    contradicted by the defendant's submission, those are assumed

6    to be true.  Do you think that's a correct statement?

7           MR. CAMERON:  It is, Your Honor.

8           THE COURT:  And so in this case we have the

9    complaint and we have the it declaration of Mr. Ashdown.  And

13:57:36 10    what else do you think?  And I suppose the exhibits attached

11    to Mr. Ashdown's declaration, though -- I'm not clear, and I

12    guess we didn't talk about this in the papers, what weight to

13    give to the exhibits in his declaration.  His declaration is

14    entitled to a certain weight in so far as he's providing

13:57:59 15    testimony based on personal knowledge.  I don't know that

16    anybody's asked me to take judicial notice of anything that

17    was submitted.  What do you think the record consists of in

18    this case factually?

19           MR CAMERON:  The record consists of the complaint,

13:58:16 20    the allegations in the complaint; the declaration of

21    Mr. Barsky, which, of course, provides some substance to the

22    Court but I think is incomplete; we have Mr. Ashdown's

23    declaration, the exhibits attached to Mr. Ashdown's

24    declaration, which consist of essentially two different types

13:58:31 25    of evidence.  The first is evidence taken from Fluent's own

1   publicly available information, so we have copies of their

2   website, copies of their terms and conditions.  Those are

3   things that are self-evident.  Mr. Ashdown doesn't need to

4   have personal knowledge of it other than to indicate to the

13:58:50   5   Court this is where it came from.  And then we have the second

6   part of that evidence, which is all the evidence that is

7   gathered from the actual e-mails in the information metadata

8   provided in those e-mails of which Mr. Ashdown does have

9   personal.  And I believe that the metadata and the actual

13:59:07   10   information from the actual e-mails in this case paint a more

11   clear picture of Fluent's business I believe provide the

12   information and really enlighten us on some of the omissions

13   from Mr. Barsky's declaration.  And then I believe that

14   Fluent's own information broadcast on its website actually

13:59:26   15   contradict some of Mr. Barsky's statements to a certain

16   extent.

17          THE COURT:  That's not going to create an issue of

18   fact that we resolve in your favor at this stage, is it?

19          MR CAMERON:  I believe it does.

13:59:35   20          THE COURT:  Do I serve as a factfinder?  Do I

21   review evidence in the world and draw conclusions about what

22   he's entitled to how much weight and the like?  I mean, it's

23   incumbent on the plaintiff in this case to contest and

24   contradict the evidentiary submissions by the defendant with

13:59:50   25   competent evidence, no?

19

1          MR CAMERON:  Yes.

2          THE COURT:  And I want to rewind for a moment

3     because I'm a teeny bit lost.  Will you tell me more about

4     what you mean when you talk about the content of the e-mails

14:00:12  5     are in the record?

6          MR CAMERON:  Yes.  We've submitted to the Court

7     examples, various examples of the e-mails which are examples

8     of essentially all of those 10,000 plus e-mails that were

9     received.  And I believe we've made the files, the actual

14:00:30  10    native files of the e-mails available to the Court.  That's

11    not something that we can submit through the paper document

12    because they're actual electronic files that need to be

13    submitted through --

14         THE COURT:  And what do you think you said about

14:00:42  15    those e-mails in your opposition memorandum and/or

16    Mr. Ashdown's declaration that you want me to rely on?

17         MR CAMERON:  I think what's important is the fact

18    that --

19         THE COURT:  Not what's important.  What did you

14:00:53  20    say?

21         MR. CAMERON:  What we said is the e-mails arrived

22    in Utah on exhibition servers, and that's not in dispute.  We

23    said at least a number of those were transmitted from

24    publishers in Utah.  We said that every single one of those

14:01:04  25    e-mails contained a link to Fluent's websites and were a part

1    of these, quote-unquote, immersive experiences.  We didn't use

2    that language.  That's language from there.  I think we called

3    it campaigns in our briefing.  Fluent's language is immersive

4    experience is from their website, which is why I'm suing it

5    because it's their language today.  But when we talked about

6    campaigns or content, that's what we're referring to in our

7    brief.

8              THE COURT:  Pause for a moment, please.

9              So this argument that you're making, I just want to

10   make sure that we're all on the same page and that we're

11   talking about an argument that you advanced in your papers so

12   that everyone had notice about the basis of your opposition.

13             I'm looking at your opposition -- I mean, the

14   argument that you're making today sounds different to me, for

15   example, the contracting elements that you're talking about, I

16   don't remember that featuring in your argument.  Did I just

17   miss it?

18             MR CAMERON:  No, Your Honor.  I don't believe I

19   used that exact language.  And I think the way that we

20   characterize it -- for example, in the introduction in the

21   statement of release requested, we outline the process used by

22   Fluent to go about its business.  That the e-mails purport to

23   come from a wide range of well recognized companies and

24   purport to offer free rewards.

25             We then identify that those e-mails link to Fluent

1    websites where they gather the information.  And we also

2    provided to the Court the terms and conditions from Fluent's

3    websites that outline the way that process worked which does

4    indicate that the existence of this intent to contract.

14:03:11    5    And so I think in submitting the actual e-mails to

6    the Court, identifying at the outset that they purport to

7    offer free rewards, those are free rewards from Fluent, and I

8    think that our argument makes that clear.  In fact, we do

9    discuss this stream of commerce argument, that Fluent is the

14:03:31    10    one who pushes this essential product into the stream of

11    commerce through its publishers and that those publishers

12    disseminate those including into Utah where these Fluent

13    products is essentially disseminated.  And the Fluent products

14    consist of what we've described which is these rewards and

14:03:47    15    these offers.

16    THE COURT:  You don't have -- you haven't submitted

17    in the record, have you, any evidence of any Utahan who

18    contracted with Fluent as a result through a solicitation

19    through one of these e-mails?

14:04:02    20    MR CAMERON:  Your Honor, that's not information we

21    would have.  That's information that Fluent would have.  And I

22    believe that the Court could allow us to conduct discovery on

23    some of these limited jurisdictional points of which there are

24    five or six I would like to highlight for the Court.  If the

14:04:14    25    Court is not inclined to find jurisdiction at this point, I do

22

1    think discover is appropriate to flush out some of these other

2    contacts.

3           THE COURT:  Now I'm becoming frustrated and maybe

4    the defendants, too.  So we started into an argument in which

5    you started advancing theories in support of your position

6    that aren't in your papers as best I can tell relying on

7    information that you didn't -- at least it wasn't clear to me

8    that this was information that was important to your argument.

9    And this appears to be a different kind of argument than you

10   advanced in your papers, nor did you ask at any time in your

11   papers or after the briefing, you didn't file a motion for an

12   opportunity to take jurisdictional discovery.

13          Was the intent that you just rest on your

14   opposition, and then if you get here and it's not going well

15   that that's a fallback position?  I mean, you file a motion if

16   you want discovery.  Or if you think that you don't have an

17   adequate factual basis to oppose the motion to dismiss isn't

18   that the time to say that to the Court?  Instead I think what

19   you've relied on in your papers as I have read it and

20   understood it was a completely different argument, which is

21   Fluent directed the flow of these e-mails to Utah so they have

22   purposely availed themselves to the state and they're subject

23   to jurisdiction for that reason.  And we don't need anymore

24   information.

25          Maybe I'm being -- I am being unfair to your

1      argument.  But isn't that the gist of what you argued in

2      27 pages in your opposition?

3                  MR CAMERON:  Your Honor, I don't believe so.  I

4      think that was part of the argument.  And I think the other

14:05:48  5      force of the argument was this stream of commerce argument.

6      It does really -- it compares the Parah case which I believe

7      is on point and directly tracks Fluent's business model, at

8      least by analogy.

9                  THE COURT:  Did you find a stream of commerce case

14:06:08 10      in which a court applied that rationale to the exchange of

11      information as opposed to products?

12                  MR CAMERON:  No, Your Honor.  Other than I believe

13      that the conclusions drawn from the stream of commerce case is

14      about constructive knowledge, and that was the California case

14:06:25 15      that we submitted to the Court that we found after preparing

16      for this, which I recognize was not in our briefing, Your

17      Honor.  We found that afterwards and submitted that to the

18      Court, which does apply similar constructive knowledge

19      standard that we find in the stream of commerce cases to the

14:06:40 20      information related cases.  And so that was the attempt to

21      bridge that gap.

22                  Your Honor, with respect to the request for

23      discovery, I agree 100 percent that the better way to have

24      gone about that would have been to submit a brief requesting

14:06:54 25      discovery.  I will say in my defense that we did recently as

1    this Court is aware go through this process with Judge

2    Parrish.  And in that case neither side had requested a need

3    for discovery, though it did come up at the hearing, and

4    Judge Parrish granted that request.  And it did not seem to

14:07:13  5    raise too many concerns.  And I apologize if I relied on that

6    too heavily and not submitting a separate motion for that.

7    Obviously we'll take your advice on that in the future.  But I

8    do apologize to the Court.

9           I do, though, believe that all of the information,

14:07:30 10    Your Honor, that I'm relying on and presenting in my argument

11    today was set forth in our briefing.  Perhaps I didn't

12    articulate it as well in the briefing as I am standing here

13    today, but we certainly did advance these arguments.  And I

14    would like to point out the final piece of this puzzle.

14:07:47 15           THE COURT:  Where do you think you advanced an

16    arguments about Fluent contracting with Utah residents?  I

17    don't think I've read that word "contracting" in your brief.

18           MR CAMERON:  No.  That word would not be found in

19    the brief.  We talked in terms of the rewards that they offer.

14:08:03 20    And --

21           THE COURT:  What I think you focused on was

22    information.  I'm reading here from Page 13, which is you sent

23    out a legal standard, and then the opening caption in your

24    argument is that Fluent purposefully directed its conduct at

14:08:22 25    Utah and placed its products which harmed XMission in Utah

25

1     into the stream of commerce.  And then as part of that what

2     you do is you open, this is the opening part of your argument,

3     and you immediately turn to the Calder effects test and the

4     three elements of that.  And then you tell us that this case

14:08:42  5     involves the continuous, repeated and deliberate sending of

6     thousands of deceptive commercial e-mails targeting Utah

7     residents with the sole purpose of directing Utah customers to

8     linked websites controlled by Fluent that are used to

9     surreptitiously gather personal information from citizens in

14:09:03 10     Utah.

11          That's what I understood your argument to be about

12     the whole time.  And what I really thought you were saying is

13     that Fluent either did it itself or directed people under its

14     control to send the e-mail, so it was reaching into the state.

14:09:15 15          Did I just misapprehend the nature of your

16     argument?

17          MR CAMERON:  No; because that's part of the

18     argument, as well.  And I think in Dudnikov it provides an

19     analogy which I think it's helpful where it talks about a

14:09:27 20     basket player, and that a basketball can shoot a ball and

21     intend to aim for the backboard, with the residual effect of

22     that going into the hoop and scoring a basket.  While the

23     player's intent was to hit the backboard, the residual effect

24     is something that could have been reasonably anticipated, and

14:09:45 25     that satisfies the second and third Calder effects for

1    knowledge.

2            That's essentially what we have there, and it's

3    that argument that I'm advancing there is the same as that

4    analogy in Dudnikov which is Fluent is shooting for the

14:09:57  5    backboard.  They're telling these publishers, including

6    publishers in Utah, disseminate these across the United

7    States.  And in doing so, their expected result of that is

8    that that ball is going to go in the hoop.

9            In this case some of these, many of these,

14:10:13  10   thousands of these end up in Utah.  And Fluent admits that it

11   makes money from these transactions.  Now this is one thing

12   that was a little bit unclear to me in Barsky's declaration.

13   But it says that Fluent makes .9 percent of its income from

14   its Utah transactions.  There's two ways that that could be

14:10:30  15   interpreted, I think both of which don't favor Fluent's

16   position.  One we've learned that .9 percent is actually a

17   significant amount of money, $2.8 million.

18           But in addition to that there are two ways that

19   Fluent could potentially make money here.  One is that it's

14:10:48  20   actually selling that consumer data to companies in Utah to

21   use, in which they it's selling to advertisers in Utah.  Those

22   advertisers are buying this data, and they're paying millions

23   of dollars for it.

24           The other way that Fluent could be making -- can be

14:11:02  25   interpreted is that that's the money that Fluent makes on

1   selling Utah consumer data, which if -- and it was unclear to

2   me frankly in the declaration.  But I think under either

3   analysis and interpretation the fact of the matter is that

4   Utah admits and could easily and reasonably anticipate and

5   knows, in fact, that it's gathering money from Utah because

6   it's making money off of that data.

7           THE COURT:  So this is more along the lines of the

8   argument I thought we'd be having today -- argument,

9   discussion based on what I understood of your opposition

10  memorandum.

11          Let me -- there must be a better analogy than the

12  one I came up with, but -- and I don't have any idea where the

13  subject of this analogy came from.  It just occurred to me.  I

14  was thinking about New Jersey for some reason.

15          So imagine that I'm a New Jersey company and I

16  specialize in making slot machines for New Jersey casinos.

17  And I run that business for 30 years, and it's really

18  successful.  I make great slot machines.  People love them.

19  But I'm a New Jersey guy, and my contacts are in New Jersey.

20          And one day, Mr. Cameron, you come to me and you

21  say, you know, this is great, but you're missing a whole

22  market.  There are all these Native American reservations

23  throughout the country where they can run casinos and they can

24  use machines like yours.  Let me go try and expand your

25  market.  And I say, wow, I have no idea.  That's a great idea.

1    Let me tell you about my machines.  And I provide you specs

2    and information and data and everything else, and I say go

3    forth, Mr. Cameron, and see what you can do.

4           And let's say you come here to Utah and you meet

5    with the Ute Indian Tribe, and you meet with the Navajo

6    Nation, and you start -- you have contacts here.  You're

7    trying to develop business.  Have I submitted to the

8    jurisdiction of the state of Utah?  I don't know you're here.

9    I didn't direct you to come here.  You chose to come here.

10   Have I purposely availed myself of the state of Utah and the

11   laws of the state of Utah, do you think?

12          MR CAMERON:  I think because in that particular

13   analogy when we're dealing with actual product coming into

14   Utah that the analysis from the Parah case that we cited

15   applies.  And I think under the analysis advanced by that case

16   the reasoning of the Court it says it doesn't make any

17   difference if the New Jersey court knows where the

18   distributors are going, if they're sending those machines in

19   the stream of commerce.

20          THE COURT:  Well, imagine you haven't sold any of

21   my machines here yet, but you're here having business meetings

22   and you're meeting with the business counsels and you're

23   trying to create a market for my machine.  I haven't shipped

24   it here.  Nobody's ordered the machine.

25          MR CAMERON:  I would still say yes, because I think

1   it's an intent by that company to conduct its business in

2   Utah.

3            THE COURT:  How is it an intent?  Suppose I've

4   never heard of the Ute Indian Tribe or the Navajo Nation?  I

14:14:04  5   have no idea they exist in the state of Utah.  I have formed

6   an intent to purposely avail myself and contact the state of

7   Utah?

8            MR. CAMERON:  I think the actions of the

9   distributors in that case do provide constructive knowledge to

14:14:17  10  the company.  The company is assumed under the law of knowing

11  the actions the distributors are taking under I think the

12  stream of commerce analysis.

13            THE COURT:  Under what?

14            MR CAMERON:  For example --

14:14:27  15            THE COURT:  That has to be under an agency theory,

16  doesn't it?

17            MR. CAMERON:  Well, I don't know that agency was

18  established in the Parah case that we cited.

19            THE COURT:  I agree.  Do you think that I can be

14:14:37  20  accountable, I can be charged with knowledge about your

21  activities and I can be accountable for your activities under

22  some other legal theory in our hypothetical?  I mean, what

23  other basis would there be at law?

24            MR. CAMERON:  I think that one point I'd like to

14:14:54  25  make is that I think the analogy isn't complete because we

1    know Fluent that is making money from Utah.  So in your

2    analogy they haven't made a sell in Utah, so the company is

3    not aware of where its money is coming from.

4              THE COURT:  What do you think the evidence is about

14:15:08  5    the source of those revenues that were generated in Utah for

6    the company?

7              MR CAMERON:  I believe they said they earned

8    .9 percent of their income from Utah.

9              THE COURT:  From what?

14:15:18 10              MR CAMERON:  Well, that was the vagueness that I

11   pointed out to the Court.  I think there are two possible

12   interpretations of that.  I think first is in companies to

13   whom it's selling the information in Utah.  Or the other

14   interpretation is that the money it's making from information

14:15:29 15   it gathers from Utahans.

16              THE COURT:  So what if they sell discounted ski

17   passes?

18              MR CAMERON:  If who does?

19              THE COURT:  Fluent.

14:15:38 20              MR. CAMERON:  Into Utah?  To Utah consumers?

21              THE COURT:  My point is just this.  Rather than --

22   am I permitted to speculate about the facts when I'm

23   determining a Rule 12(b) motion, or am I required to examine

24   the facts in the record based on personal knowledge?

14:15:54 25              MR CAMERON:  I'm not asking you to speculate about

1   the facts, Your Honor.

2          THE COURT:  Why aren't you?  When I ask you what

3   the source of the revenue of the state is, don't we need to

4   make some connection between Fluent's activities in the state,

14:16:06 5   the revenue in your claims for purposes of establishing

6   specific jurisdiction?

7          MR CAMERON:  And if I understand your question,

8   you're asking me if there's a nexus directly between the

9   revenue, .9 percent of revenue that Fluent earned and the

14:16:19 10   e-mails sent to my client.

11          THE COURT:  That's one question, yes.

12          MR CAMERON:  Okay.  And frankly, Your Honor, I

13   don't have an answer to that question because I don't know.

14   Those dots have not been connected.

14:16:28 15          THE COURT:  So the disadvantage then is that I

16   don't know, either; right?

17          MR. CAMERON:  Exactly.

18          THE COURT:  So what should I -- what facts should I

19   draw from the record in front of us?  Not inferences, but what

14:16:41 20   facts are fairly drawn?  There's the .9-percent revenue.

21   That's over a three-year period; is that right?

22          MR. CAMERON:  That's correct.

23          THE COURT:  About 3 million since 2015?

24          MR CAMERON:  That's correct.

14:16:50 25          THE COURT:  For what we don't know; right?

1          MR. CAMERON:  Exactly.

2          THE COURT:  Okay.

3          MR CAMERON:  And the facts -- obviously that's

4     related to the income.  The other facts which we've identified

14:16:58  5     for the Court include having publishers in Utah.

6          THE COURT:  Do you think if Fluent sold discounted

7     ski passes in Utah and that's the source of their revenue from

8     the state that it's relevant in any way to specific

9     jurisdiction for your CAN-SPAM claims?

14:17:18  10          MR CAMERON:  No, of course not; unless the e-mails

11     were offering discounted ski passes.

12          THE COURT:  Okay.  Okay.

13          MR CAMERON:  And I believe, Your Honor, that it's

14     important just simply to complete the argument, and I

14:17:33  15     understand all of the concerns that Your Honor has with the

16     argument that I'm advancing today, and I appreciate those

17     concerns and I appreciate the opportunity to learn.  I would

18     like to point out that I think the record is clear on a few

19     points, and that is that Fluent intentionally directs or

14:17:53  20     creates immersive experiences, that it intends that those be

21     transmitted nationwide into Utah, that it anticipates that

22     those will arrive in Utah.  Their website obviously includes

23     Utah in its drop-down menu.  That one way or another they're

24     earning revenue from Utah.  And I understand that we haven't

14:18:15  25     made that connection.  That's information that we simply don't

33

1    have.

2             We also know that Fluent relies on publishers in

3    Utah to disseminate these e-mails.  And the e-mails on their

4    face, which we submitted various to the Court, show the intent

14:18:26    5    of those e-mails as do the terms and conditions of Fluent's

6    website that we've also submitted to the Court, that they are

7    attempting to transact business through those e-mails.

8             And I think when we take that collectively and then

9    look at the role where XMission fits in that, XMission stands

14:18:41   10    in the middle of all of that.  Without Fluent's publishers

11    utilization of XMission's service in Utah none of these

12    e-mails would have been disseminated.  And XMission stands as

13    the gatekeeper.  And under the statute Utah is really the only

14    place they can suffer their harm.  And but for Fluent's

14:19:00   15    creation of immersive experiences and direction to their

16    publishers to send them to Utah XMission would not have

17    received any of those.  It would never have had occasion to be

18    harmed.  And I think that's the nexus in and of itself.

19             THE COURT:  So that argument that you just made,

14:19:18   20    doesn't that run afoul of, my thinking of the Walden decision,

21    thinking the one involving the Nevada residents?  What we need

22    to be focused on in your discussion today I think are Fluent's

23    contact with the state, not harms that Utah residents suffer.

24             MR. CAMERON:  Of course.

14:19:37   25             THE COURT:  Okay.

34

1          MR. CAMERON:  And I'm talking about harm that

2     XMission suffered as the result of Fluent's intentional

3     conduct.

4          THE COURT:  Okay.

14:19:43   5          MR CAMERON:  Which was the creation of these and

6     instructions to its publishers including those in Utah to

7     disseminate these out into the ether, so to speak, into the

8     cloud.  And without that XMission would have never received

9     those.

14:19:58  10          THE COURT:  You're advancing that argument I think,

11    what, as part of the Calder effects test?

12          MR. CAMERON:  Yes; under the third factor, yes.

13          THE COURT:  Okay.

14          MR. CAMERON:  Yes.  And that's --

14:20:10  15          THE COURT:  So Mister -- I want to say Barsky.

16    It's Barsky, is it?

17          MR. BARSKY:  Yes.

18          THE COURT:  Mr. Barsky says in a sworn affidavit or

19    declaration, declaration that Fluent has no involvement with,

14:20:37  20    no control over the origination, approval or delivery of the

21    e-mails, does not see the e-mails before they're sent by the

22    publishers, does not know where the publishers send the

23    e-mails, either to who the recipients are or where they

24    reside, where they're located, doesn't decide the customers to

14:20:59  25    whom the publishers should publish the e-mails, but does give

1    direction that only customers who agreed to receive them

2    should receive them.

3            Do you think that any of those facts are directly

4    contradicted by Mr. Ashdown's declaration?

14:21:17  5            MR CAMERON:  I think the first fact is that they

6    don't -- and I don't have it in front of me, but that he

7    doesn't get involved in the, what does it say?  The

8    origination or --

9            THE COURT:  Involvement with or control over the

14:21:31 10   origination, approval or deliver of the e-mails?

11            MR. CAMERON:  I think that fact is contradicted by

12   Barsky's own statement.

13            THE COURT:  Where?

14            MR. CAMERON:  I don't have the paragraph in front

14:21:40 15   of me, but where he talks about that Fluent is the one who

16   creates the content for the e-mails.

17            THE COURT:  Do you mean -- so that's Paragraph 4,

18   maybe.  Fluent participates in campaigns in which Fluent

19   provides advertising content to publishers, and then the

14:21:55 20   publishers distribute the advertisements to their audiences?

21            MR. CAMERON:  That's correct.  The advertising

22   content that Fluent creates is the content for these e-mails.

23   That's participation in the origination of an e-mail.  An

24   e-mail requires the header and it requires content.  That

14:22:10 25   contact comes from Fluent.

1    THE COURT:  Okay.  And maybe we've started to slip

2    into the merits of a CAN-SPAM claim.  But he didn't say

3    content.  Origination, approval or delivery of the e-mails.

4    You think that that's contradicted because Fluent provides the

14:22:31  5    content.

6    MR CAMERON:  Exactly.

7    THE COURT:  Okay.

8    MR CAMERON:  An e-mail and especially their

9    e-mails, which we've seen copies, don't exist without the

14:22:41 10    content.  The content is the main part of that e-mail.  And

11    that's created and provided by Fluent.  And so in essence they

12    are involved in the origination of those e-mails.

13    THE COURT:  Does Fluent deliver the e-mails to Utah

14    residents?

14:22:53 15    MR CAMERON:  It doesn't click send on the e-mails.

16    It relies on other third-party publishers to do that.

17    THE COURT:  How does Fluent -- with the facts on

18    the face of the record before us, how does Fluent touch Utah

19    residents?

14:23:09 20    MR CAMERON:  In various ways.  The first is because

21    it contracts with publishers in Utah to send these.  I think

22    when it contracts with publishers in Utah it knows that

23    there's a highly likelihood that those e-mail are going to go

24    into Utah.

14:23:24 25    THE COURT:  What do I do with this?  Mr. Barsky

1  says in Paragraph Number 7 in his declaration, none of

2  Fluent's business activities occur in Utah.

3          Do you think that there's evidence that Fluent has

4  a business relationship with a Utah publisher?

14:23:40  5          MR CAMERON:  Yes.  And we have submitted that

6  through Mr. Ashdown's declaration.

7          THE COURT:  Well, what did Mr. Ashdown say?  He

8  said that at least some of the e-mail appear to have

9  originated from a Utah publisher.  Do you have any evidence

14:23:53 10  that that's a Utah publisher with whom Fluent has a business

11  relationship?

12          MR. CAMERON:  Well, what we have evidence of is it

13  was a Utah publisher who sent the e-mails in question, which

14  are Fluent e-mails.

14:24:04 15          THE COURT:  At whose direction?

16          MR CAMERON:  Well, I assume Fluent's because they

17  admit that.  They admit they worked directly with the

18  publishers to send those e-mails.

19          THE COURT:  Well, did that admit anywhere that I

14:24:12 20  just missed that they worked directly with the Utah publisher

21  who sent these?

22          MR. CAMERON:  No, they didn't.

23          THE COURT:  Is there any evidence before us that

24  Fluent had any knowledge that any Utah publishers were

14:24:25 25  involved in sending e-mails to Utahans?

1          MR CAMERON:  No.  And it's the absence of that that

2     I highlighted for the Court, which I think is interesting, to

3     put it nicely.

4          THE COURT:  So my staff is tired of hearing this,

14:24:40  5     but it illustrates the point.  I think my law clerks are very

6     alarmed that when I tell them on the first day of their

7     clerkship that they're going to be required to get two massive

8     tattoos, one on each arm, one that says standards and one that

9     says burdens.  And it's because we're just a trial court, and

14:24:59  10    we don't make up the law.  We just try to apply it.  So I go

11    searching for the standard, and then I try to apply it.

12          You agree with me it's your burden today, you're

13    here with the burden to prove that there's a factual basis to

14    create jurisdiction.  It's not their burden, and omissions in

14:25:14  15    their submission create no fact in favor of your showing.  Do

16    you disagree with that?

17          MR CAMERON:  No, I don't disagree with that, Your

18    Honor.  I think that we've submitted evidence to support a

19    finding of jurisdiction.  And I believe to the extent we

14:25:27  20    haven't that that's why I followed that with the request to

21    conduct discovery because I think we have identified and this

22    hearing has certainly helped to identify various areas where I

23    think discovery would be appropriate and important for the

24    Court to make a fully informed decision.

14:25:39  25          THE COURT:  Of course we can't evaluate that

1    because you didn't prepare and file a motion telling us what

2    information you needed and where you could obtain it and how

3    long you would need and then get a response from the

4    defendants so I could evaluate it under the rules and the

14:25:52  5    standards that govern that.

6          MR. CAMERON:  And I appreciate that, Your Honor.

7    Of course I would be happy to articulate that now.  And, of

8    course, Mr. Newman can respond to that if the Court would

9    indulge me.  Or I could request leave to submit a written

14:26:04 10    brief on that point, and we could do that forthwith.

11          THE COURT:  Lest you think I'm trying to pick on

12    you and your client, I don't have a dog in this fight.  But

13    the one thing I'm constantly thinking about when we're in

14    these hearings and the reason you're getting so much feedback

14:26:20 15    from me today is I think a lot about fairness.  And every coin

16    has two sides.

17          MR CAMERON:  Of course.

18          THE COURT:  You're here advancing an argument about

19    contractual relationships with Utahans that wasn't in your

14:26:33 20    papers, and I as a rule think we ought to limit and confine

21    our arguments to those we gave notice of to the other side and

22    to me so if there's relevant case law or facts those can be

23    developed before we start talking about it.

24          And the same is true with motions.  Is it fair for

14:26:46 25    a defendant to pay their lawyers to brief these issues,

1          prepare for oral argument and then get here just to learn

2          that, oh, actually we just needed discovery?  And so forget

3          the time and energy and attorney's fees and expense you've

4          incurred.  Now it's going to be a different issue.  It's just

14:27:05   5          a question of fairness in my mind.  That's why I'm pressing

6          you about it today.

7                    I keep interfering with your argument by asking

8          questions.  But tell me, we've covered a lot of ground.  It's

9          not really the presentation you prepared to give.  But what

14:27:21  10          else haven't you told me that you think is important

11          concerning the motion?

12                    MR. CAMERON:  Your Honor, I appreciate, in fact,

13          the direction from the Court.  I think we've navigated the

14          argument that I prepared --

14:27:30  15                    THE COURT:  Okay.

16                    MR. CAMERON:  -- and that I intended to give.

17                    I would like to point out, though, that in

18          Paragraph 7 which you pointed to me from Mr. Barsky's

19          declaration it does say that none of Fluent's business

14:27:42  20          activities occurred in Utah, that's one of the statements I

21          think is directly contradicted by the fact that Fluent earns a

22          significant amount of money from its business contacts.  So it

23          begs the question of how can Fluent not have business activity

24          in Utah but then earn nearly $3 million from its activity in

14:27:59  25          Utah?

1          THE COURT:  And I don't know Mr. Barsky, and I make

2     no judgment about this.  But the way that this works is that

3     I'm required to assume the truth of a sworn declaration or

4     affidavit.  And sometimes those declarations are contested by

14:28:13  5     other sworn declarations, and some day a factfinder makes a

6     decision.  The safety net I've always thought underneath the

7     rules that we rely on, this is true in the Rule 56 context, as

8     well, that if someone purgers themselves to get away from

9     something, then there are consequences for that.

14:28:33  10          Mr. Barsky, I'm not suggesting that you committed

11     perjury.

12          My point is he said what he said.  And if you

13     become aware of facts at some point that directly contradict

14     his sworn testimony, then I imagine we'll be back talking

14:28:44  15     about that at some point.

16          MR. CAMERON:  Your Honor, what he does say with

17     respect to the income is that Fluent generates almost no

18     revenue, less than .9 percent from Utah customers.  So there's

19     an admission that they generate revenue directly from Utah

14:29:01  20     customers.

21          THE COURT:  Agreed.

22          MR. CAMERON:  He says almost no revenue.  I don't

23     characterize nearly $3 million as almost no revenue.  I don't

24     know that anybody reasonably could, but that's how he states

14:29:11  25     it.  However, in Paragraph 7, he says, Fluent has no business

1      activities that occur in Utah.

2              And so it just begs the question of how can both of

3      those statements be true?  I think it highlights an essential

4      lack of credibility in this statement.  And I understand that

14:29:24  5  we didn't have an ability to present directly contradictory

6      evidence because it's not information that we have.  And

7      perhaps the better way to go about that would have been to

8      submit a motion on -- for additional discovery on

9      jurisdiction.  And I've explained the reasons why we didn't do

14:29:42  10  that.

11             But I would like if the Court will just indulge me,

12     to identify what I think the specific points are that do

13     require discovery to the extent the Court would indulge me.

14     And Mr. Newman could certainly address that.

14:29:56  15             THE COURT:  You certainly have the right and

16     opportunity to make a record today while we're here.  Let's

17     make sure it's complete.

18             MR. CAMERON:  With respect to the immediate

19     paragraphs that we're looking at, Paragraphs 7 through 18,

14:30:10  20  Mr. Barsky identifies and enumerates a number of contacts that

21     it does not have with Utah.  But within that are various

22     admissions of the type of activity in which it engages as a

23     matter of its business.

24             For example, as we talked about it it admits that

14:30:27  25  it works with publishers.  What we don't have is the number of

43

1    publishers who are in Utah and to what extent Fluent is paying

2    those Utah publishers and to what extent those Utah publishers

3    are involved in the e-mail transactions in this case.  That's

4    information that Fluent would have.  It's not information that

14:30:44   5    my client would have access to.

6            In addition to that Fluent admits that it pays

7    publishers for generating traffic to its website, but it does

8    not identify for us how much traffic to their websites are

9    coming from Utah consumers.  That's information that Fluent

14:30:59   10    has that there's no way for my client to obtain other than

11    through Fluent.

12            Fluent admits that it gathers personal information.

13    Its websites admit that.  But there's no indication in the

14    record of how much information from Utahans was gathered by

14:31:11   15    Fluent.  And that's information that only Fluent has that I

16    believe would inform a jurisdictional decision.

17            Similarly, Fluent admits that it pays rewards to

18    people.  In fact, it's contractually obligated to.  We don't

19    know to what extent it's paying rewards to people in Utah.

14:31:30   20    That's information that would inform a jurisdiction analysis

21    that Fluent has.

22            Fluent sells data to advertisers.  We don't know to

23    what extent it sold Utah data.  That's another piece that we I

24    think need to discovery on.  And the second half of that is,

14:31:45   25    to what extent it's selling that information to Utah

1    companies.  That would be additional contact with Utah that I

2    believe would inform the decision.

3         And then I think that in addition to that, there's

4    discovery that needs to be had on Fluent's actual knowledge of

5    where its e-mails are disseminated.  I don't know exactly how

6    their business operates, and I don't know what kind of

7    transparency there is, but I do know that most companies in

8    the position of Fluent do operate various services to -- for

9    the express purpose of monitoring e-mail traffic.  And there

10   are various services out there, one of which is called

11   LashBack that I would assume that Fluent uses.  The entire

12   purpose of LashBack is to monitor those e-mails.  And if there

13   is a monitoring process in place I believe there would be

14   evidence that would show Fluent is aware that e-mails are

15   being sent to Utah based off of its ongoing monitoring process

16   of those e-mails.  And I think that also would contradict

17   Mr. Barsky's statement, that it doesn't engage in any

18   monitoring and has no reason to know where e-mails are being

19   sent.

20        So that's the information that I believe was absent

21   and notably so from Mr. Barsky's declaration that I believe if

22   the Court permits us to conduct discovery which I could

23   prepare written discovery requests and have them sent out next

24   week to get that ball rolling that would be very informative

25   to the jurisdictional analysis.

1          THE COURT:  What is the status of the New York dec

2     action filed by Fluent?

3          MR CAMERON:  It has been stayed pending the outcome

4     of this Court's decision.

14:33:27  5          THE COURT:  Okay.

6          MR CAMERON:  And we submitted a status report --

7     what was it week, Scott?

8          Last week to the Court indicating a request that

9     that matter continue to be stayed.

14:33:38 10          THE COURT:  Is that in federal court in New York?

11          MR CAMERON:  I believe so.

12          THE COURT:  Okay.  Great.  Thank you, Mr. Cameron.

13          MR CAMERON:  Thank you, Your Honor.

14          MR. NEWMAN:  Your Honor, I'd like to address three

14:34:04 15     main points.  First, I'd like to correct some factual

16     discussion that my good friend Mr. Cameron just had; second,

17     I'd like to discuss why Fluent isn't subject to specific

18     jurisdiction in the state of Utah, namely, because it didn't

19     purposefully direct any activity to the state of Utah, and the

14:34:23 20     injury that XMission now alleges doesn't arise out of any

21     Fluent's activity in Utah or elsewhere; and, third, if the

22     Court will indulge me I would like to address four cases, two

23     binding, two persuasive, each of which I think resolve this

24     matter.

14:34:39 25          Let me start with the facts.  The record is clear

1    and it's accurate, and I would be happy to accept questions

2    from the bench about Fluent's business even if it's not in the

3    record, but Fluent operates a business and it does place links

4    with third-party publishers.  Its third-party publishers have

5    customers that have requested e-mail, and those third-party

6    publishers are in the business of sending e-mail.  So to the

7    extent that Fluent does not place its link with a publisher,

8    the e-mail still goes out.  It just doesn't have Fluent's link

9    in it.

10   And it is true that Fluent does provide some

11   content for e-mails to publishers, but that content does not

12   issue in this case.  This is a CAN-SPAM case.  Cam span

13   prohibits false and misleading header information.  Fluent is

14   not responsible for the header information except to the

15   extent that anybody that sends e-mail marketing that Fluent

16   advertises with is required under contract to agree that there

17   won't be any false misleading headers and there's more

18   specific in other language that the publishers must agree to

19   beyond that so that Fluent can assure that it's not called

20   into court in a case like this.

21   So this case is about e-mail headers.  It's not

22   about e-mail content.  And the publishers are entirely

23   responsible for those e-mail headers.  Fluent has no

24   responsibility for them.

25   THE COURT:  And you would say that Mr. Cameron

1    should just go sue all of your publishers who reached in the

2    state of Utah and bring them here because they're the ones who

3    have purposely availed themselves of the state.

4           MR. NEWMAN:  It is correct, Your Honor.  Recently

14:36:18  5    the 10th Circuit Court of Appeals --

6           THE COURT:  I've heard of that court.

7           MR. NEWMAN:  I've heard of that court, too.  And in

8    2017, just last year, the Court held that specific

9    jurisdiction should be revisited in light of the Supreme Court

14:36:34 10    case Walden v. Fiore.  And in Old Republic vs. Continental

11    Motors, 877 F. 3d 895, the Court came up with a comprehensive

12    decision that reviewed personal jurisdiction as it exists in

13    this state and talked about how specific jurisdiction, the

14    inquiry, the purposeful availment inquiry, is designed to

14:36:56 15    prevent somebody being hailed into court for an attenuated

16    fortuitus act, an act that unilaterally done by a third party.

17           That's what happened here.  The publishers may or

18    may not have used false or misleading headers.  To the extent

19    they did they're liable.  That's a unilateral act by a third

14:37:17 20    party.

21           Purposeful availment has --

22           THE COURT:  Well, Fluent may also have liability

23    under the broad statute, but that's a question for another day

24    and maybe another court.

14:37:27 25           MR. NEWMAN:  We concede, Your Honor.  To the extent

1    that Fluent procured e-mails and the merits part of the case,

2    we will argue and I'm confident we will win it did not procure

3    e-mails.  But to the extent it did it would face liability.

4    That's why this isn't a 12(b)(6).  It's a 12(b)(2).  But the

14:37:43  5    Court, 10th Circuit Court of Appeals has repeated that

6    purposeful availment requires that a defendant purposefully

7    direct activity to forum state to the state of Utah.

8         And here Fluent did not purposefully direct

9    activity to the state of Utah.  It placed links with

14:38:00  10    publishers.

11         THE COURT:  It accidently made $3 million in

12    revenue from the state?

13         MR. NEWMAN:  No, Your Honor.  It intentionally made

14    $3 million from the state, but those don't relate to this

14:38:11  15    case.  So I was pleased that XMission conceded general

16    jurisdiction.  If we're having a general jurisdiction

17    discussion the court might ask whether there's systematic

18    continuous contacts, and I suppose revenue from the state

19    would go towards that inquiry.

14:38:17  20         But the revenue that Fluent generated from

21    advertisers have nothing to do with this case.  They weren't

22    advertised in these e-mails.  The money didn't come from

23    consumers who received the e-mails.  That money from Fluent's

24    advertisers is completely outside of the scope of the facts of

14:38:42  25    this case.  And so that money that Fluent received is

1    irrelevant to the specific jurisdiction analysis that was in

2    the declaration because it was addressing general jurisdiction

3    which has been conceded.

4           Purposeful availment requires that there's directed

14:38:59  5    activity at the state, and specific jurisdiction also requires

6    that harm arises out of those contacts.  Here even if you

7    assume that there are relevant contacts, which there's not,

8    none of the harm arose out of Fluent's activities.  Rather

9    they arose out of third-party publishers that may have

14:39:19 10   submitted false or misleading headers and sent e-mails into

11   the state.  And those e-mails would have been sent with or

12   without Fluent's link.  And presumably there would have been

13   false or misleading headers with or without Fluent's link.  So

14   the purposeful availment doesn't exist, and the harm that

14:39:36 15   XMission alleges is not on a rise out of Fluent's activity,

16   therefore, no personal jurisdiction.

17          The four cases that I'd like to address, the first

18   one is Walden vs. Fiore, the United States Supreme Court case

19   that revisits Calder vs. Jones effects test.  And Walden was

14:39:53 20   interesting because it notes that we must look at the

21   defendant's connection to the forum.  We don't look at the

22   defendant's connection to the plaintiff.

23          In that case there was an alleged false statement

24   by a police officer of probable cause.  And he was in Georgia,

14:40:11 25   the plaintiff was in Nevada.  The Nevada felt those effects,

1    and there was a lawsuit filed in Nevada.  And the

2    Ninth Circuit Court of Appeals said that was sufficient for

3    jurisdiction purposes.  And the Supreme Court took it up and

4    said it was not because even though the police officer in

14:40:27  5    Georgia could have anticipated that this plaintiff Nevada was

6    going to feel harm, that's not enough.  There has to be

7    activity directed to the state, and it's not just the

8    plaintiff that can be only nexus.  So that's the first case I

9    would point out.

14:40:38  10          The second case I would point out we already talked

11    about, which is Old Republic vs. Continental Motors.  That

12    case was very interesting.  In that case the defendant sold

13    these manuals about airplane safety.  And the plaintiffs

14    insured crashed an airplane relying on those manuals.  And

14:40:59  15    that manual was purchased from the forum state.  And, in fact,

16    the defendant published on its Internet website who its

17    customers were, and so the defendant knew that this person

18    that ended up with the crashed airplane was from the forum

19    state and communicated with that person in the forum state and

14:41:15  20    provided customer service over the telephone to the forum

21    state, but, yet, the 10th Circuit Court of Appeals said that

22    was not enough because the activity of the defendant wasn't

23    directed at the forum state.

24          The two persuasive cases I would like to discuss,

14:41:31  25    first is Fenn vs. Mleads.  This one is my favorite.  It's a

1    2008 Utah Supreme Court case.  I argued that case.  And in

2    that case under Utah State law it was unlawful to send spam in

3    general.  It wasn't about false or misleading headers.  It was

4    like any e-mail.  It was a class action, and the plaintiff

14:41:51  5    alleged my client had sent tens of millions of e-mails.  And,

6    in fact, my client conceded that.  And so the question was,

7    shouldn't my client know that some of those e-mails are going

8    to arrive in Utah?

9         We suggested that the activity wasn't directed at

14:42:05  10   Utah, even though perhaps it's logical that every state would

11   receive e-mails.  We moved to dismiss.  The Court granted that

12   motion.  The intermediate Court of Appeals reversed, but then

13   the Supreme Court of the state took it up, and the holding

14   Fenn vs. Mleads is that if there is an impact on the state

14:42:24  15   that is meaningful there might be jurisdiction.  Otherwise

16   there's not.  So is there meaningful impact here?

17        Well, I took the deposition of the plaintiff in

18   this case in another case.

19        THE COURT:  Do you take issue with the footnote in

14:42:37  20   Judge Parrish's Zoobuh decision that to the extent that the

21   Utah Supreme Court has case law that provides a different

22   standard than that provided by the Supreme Court and

23   10th Circuit?  It's not governing.

24        MR. NEWMAN:  I would agree with that, which is why

14:42:53  25   I said this is a persuasive case, not a binding, but yet my

1    favorite.

2            THE COURT:  Do you think it's helpful in view of

3    the personal jurisdiction standards that have been articulated

4    by the Supreme Court in the 10th Circuit in recent years?

14:43:05  5            MR. NEWMAN:  I do because I believe that that 2008

6    Utah Supreme Court case is consistent with the recent cases

7    that are binding and they have the same theme.  There must be

8    a meaningful impact on the state that the defendant --

9            THE COURT:  Do you think that if that's a

14:43:19 10   proposition in which I'm going to hang my hat I should cite

11   the Utah Supreme Court instead of the United States Supreme

12   Court?

13           MR. NEWMAN:  No, Your Honor.  I would expect this

14   court to cite the Utah Supreme -- excuse me -- the United

14:43:32 15   States Supreme Court Walden v. Fiore and the 10th Circuit

16   Court of Appeals Old Republic vs. Continental Motors, and then

17   perhaps there would be a footnote which addresses my favorite

18   case Fenn vs. Mleads.  But the holding in Fenn vs. Mleads is

19   applicable that there is no meaningful impact on Utah.  We

14:43:51 20   know, and I don't think this is disputed, although it's out of

21   the record and if the Court will indulge me I'd like to

22   address it, we know that XMission because they make this

23   publicly available receives 2 million e-mails a day --

24           THE COURT:  You know, I didn't let Mr. Cameron go

14:44:06 25   beyond the record, and I'm not really interested in -- unless

1    I accidentally rely on something that's not in the record, I'm

2    confined to what you've submitted.

3              MR. NEWMAN:  All right.  Then I should stop, and I

4    will.

14:44:15  5              THE COURT:  Okay.

6              MR. NEWMAN:  The final case that I would like the

7    Court to consider the Court has already raised.  It's

8    <u>Zoobuh v. Williams</u>.  And that case is this case.  In that case

9    there were third-party publishers, and there was a marketer

14:44:29 10   called Thrive, and Thrive placed its links in the publisher's

11   e-mails.  And the Court I believe correctly held that Thrive

12   is not subject to personal jurisdiction here because Thrive

13   did not purposefully direct activity to Utah.

14              That case is not binding on this court, but I think

14:44:43 15   it is very well reasoned.  And I think that the Court should

16   follow that case because of the Supreme Court and the

17   10th Circuit cases which are binding that are the cases cited

18   by that court.

19              THE COURT:  And my view is that that holding by

14:44:59 20   Judge Stewart is not inconsistent in any way with

21   Judge Parrish's Zoobuh ruling, but there are just different

22   facts presented.  Is that your view?

23              MR. NEWMAN:  Yes, Your Honor; because in the

24   Judge Parrish case that defendant MineShare sent e-mails, it's

14:45:13 25   a list that had Utah customers on the list.  But in that case

1    Mineshare was subject to jurisdiction here.  The marketer that

2    hired MineShare was not.  Fluent is the marketer that hired

3    the publisher, and it is not subject to jurisdiction here.

4            THE COURT:  Mr. Cameron says that we'd be engaged

14:45:31  5    in a great disservice if we sent Fluent away without an

6    opportunity for the plaintiff to develop the facts that are

7    necessary for us to really determine whether or not Fluent has

8    submitted to the jurisdiction of the state.  And you say what?

9            MR. NEWMAN:  Your Honor, we filed a motion to

14:45:52  10    dismiss for lack of personal jurisdiction, and we laid out the

11    facts in support of that motion.  I think it was at that time

12    that XMission should have decided, will I respond or will I

13    request jurisdictional discovery?  And it responded.  And now

14    there's been substantial resources on both sides.  There's

14:46:11  15    opposition, there was the reply, there was supplemental

16    authority.  My clients and I both flew out here today and

17    prepared for this hearing.  I think it's too late for XMission

18    to be asking for jurisdictional discovery.

19            THE COURT:  The 10th Circuit has many times stated

14:46:28  20    in its decisions that there's a strong preference in this

21    circuit for the resolution of claims and issues on the merits

22    and that the rule should be construed and applied in a way to

23    allow for the resolution of claims and issues on the merits.

24    That ordinarily augurs in favor of allowing discovery,

14:46:52  25    allowing more opportunities, allowing a chance to amend

1    pleadings.  And it's always a careful balance.  And what harm

2    is there here to Fluent in allowing some limited

3    jurisdictional discovery?

4            MR. NEWMAN:  To the extent that the Court granted

14:47:07  5    jurisdictional discovery at the time of the motion before all

6    the significant resources went into a factual record that is

7    now being challenged, it should have been challenged before, I

8    think there's been a burden on all the parties and that that

9    burden means that XMission waived the right to ask for

14:47:28  10   discovery.

11           But let me address the discovery that XMission

12   requests.  Towards the end of my good friend Mr. Cameron's

13   arguments he discussed what he would ask for.  And I think

14   almost all of it went to general jurisdiction, which has been

14:47:41  15   conceded.  How much money XMission received from the state and

16   the source of it, not relevant.  How many contracts it has

17   with Utah parties, not relevant.  The only fact that XMission

18   seeks to discovery I think is relevant is whether XMission

19   contracted with publishers in the state of Utah.  But even

14:48:05  20   there I don't think that that is targeting activity in the

21   state of Utah out of which the harm arose.  And so again I

22   would say that it's more on point than the other topics but

23   still irrelevant.

24           I'd also like to address while I'm at it that the

14:48:20  25   allegation that there was a publisher in Utah is without

1    factual support in the record.  Mr. Ashdown notes a domain

2    name.  He looks up where the domain name is registered, and it

3    looks like it's registered in Utah.  That domain name may or

4    may not have belonged to a publisher.  That publisher may or

5    may not be in Utah.  The address of that publisher in the

6    domain record may or may not be true or false.  None of that

7    is in the record.  There's nothing in the record indicating

8    that there was a publisher in Utah that sent any of these

9    e-mails.

10            THE COURT:  I can't be sure, but it seems to me

11    like you're just highlighting the insufficiency of the factual

12    record in front of us.  But let me -- before I get onto that

13    point, let me say I think you're overstating what Mr. Cameron

14    said about general jurisdiction.  It wasn't my intent to

15    browbeat him into conceding general jurisdiction.  I don't

16    think he did.  I challenged the basis on which he had to

17    advance that argument in this brief.  It's not an issue that's

18    off the table.  In the event that we invite jurisdictional

19    discovery, I don't understand what anything that Mr. Cameron

20    said today would be a waiver of any position that XMission

21    could advance if it had a basis for that.

22            MR. NEWMAN:  All right.  Well, I would be pleased,

23    Your Honor, to address general jurisdiction.

24            THE COURT:  I don't think it's before us today.

25            MR. NEWMAN:  All right.  Then I won't.

1          So, Your Honor --

2          THE COURT:  Is it true, do you think, that the

3     effect of allowing jurisdictional discovery at this stage

4     would be to -- I suppose what we would have to do is deny

14:50:16  5     without prejudice the motion to dismiss so that if we got to

6     that point Fluent could file a new motion to dismiss that was

7     tailored to whatever factual record was developed in the

8     course of discovery.  And the arguments and the legal

9     authorities that Fluent would rely on may or may not be

14:50:38 10     different but most likely would be different.  And, of course,

11     we wouldn't have competing motions from the same party seeking

12     the same relief.  And then we would have -- we would just

13     start all over again with briefing on 12(b)(2); right?

14          MR. NEWMAN:  Yes, Your Honor.  If the Court was

14:50:53 15     inclined to do that.  And I hope the Court is not.  I hope the

16     Court would award Fluent fees for having briefed and traveled

17     to attend today's hearing on a record that would be replaced

18     by a new one.

19          THE COURT:  I mean, this is my point.  I'm just

14:51:07 20     trying to make sure I understand correctly, and I'll ask

21     Mr. Cameron to respond, what I think the implications of what

22     he's asking for might be.  So I suppose we would just have a

23     whole new set of briefing after jurisdictional discovery

24     continuing to stay an action that's -- that was filed before

14:51:26 25     this one in another court and then I guess come back and have

1   another hearing and then have a decision and deal with that

2   before we even approach the merits of the case.  Is that what

3   you think the implication of his request is?

4         MR. NEWMAN:  Yes, Your Honor.  And I should address

14:51:42   5   that the case filed in United States District Court for the

6   Southern District of New York was first filed, and there is

7   this first filed doctrine which councils courts that generally

8   the first filed should proceed.  And we're ready to proceed

9   with that action.

14:52:00   10         THE COURT:  All right.  What else do we need to

11   know, Mr. Newman, besides what we've already talked about?

12         MR. NEWMAN:  I don't think I wish to take up

13   anymore of the Court's time, but I would be pleased to answer

14   any questions.

14:52:09   15         THE COURT:  Well, my time is your time.  I'm here

16   to serve all of you, not the other way around.  I didn't mean

17   to cut you off from making any arguments you think you have to

18   make today.

19         MR. NEWMAN:  Well, I was prepared for general

14:52:16   20   jurisdiction.  I don't get to make those arguments, and I'm

21   fine with that.  Thank you, Your Honor.

22         THE COURT:  Thank you.

23         Mr. Cameron, two questions.  One is whether you

24   wish to respond to anything Mr. Newman said.  But maybe before

14:52:30   25   we do that, am I being unfair in thinking about what the

1    implication of your motion for jurisdictional discovery, your

2    oral motion today for jurisdictional discovery would require?

3                    MR CAMERON:  I don't believe that it would require

4    to the extent what the Court has articulated.

14:52:48  5                    THE COURT:  Why?

6                    MR CAMERON:  If I can respectfully disagree.

7    Because what we have in front of the record is motion to

8    dismiss where Mr. Barsky laid out a sworn statement.  That

9    likely will not be changed or contradicted.  It was intended

14:53:00  10   to be a sworn and complete statement on the issues of

11   discovery.

12                   THE COURT:  You don't think that Mr. Barsky --

13   let's just say that there are interrogatories propounded on --

14   this is all assuming I allow discovery which I'm not inclined

14:53:12  15   to do.  But suppose Fluent answers interrogatories, say

16   there's even a deposition, you don't think that the

17   declara- -- that Fluent would have an opportunity to submit a

18   more complete declaration that accounts for the evidence that

19   was developed in discovery?

14:53:28  20                   MR CAMERON:  No.  It certainly would.  And I would

21   even concede that they can do that in a reply brief in order

22   to expedite that.  What I'm saying is I don't believe that the

23   initial briefing on the initial motion to dismiss would need

24   to be redone.  I think what would need to happen is a

14:53:43  25   supplemental opposition that addresses the new material and a

1    supplement reply wherein Fluent would be permitted to address

2    through declaration or otherwise information that it believes

3    contradicts the record created through that discovery.  So I

4    believe that could happen on a more expedited basis.

14:53:58 5          And if the Court desired oral argument on that

6    point certainly we would attend and appear.  But if the Court

7    wanted to rule without oral argument, we would obviously

8    understand, as well.

9          THE COURT:  On the substance of Mr. Newman's

14:54:12 10   comments and arguments, any response?

11         MR. CAMERON:  I do have two responses.  The first

12   is Mr. Newman says this case doesn't involve the e-mail

13   content, and that is an incorrect statement.  In the complaint

14   under the third cause of action it specifically addresses

14:54:24 15   e-mail content under the CAN-SPAM Act 15 USC 7704(a)(5)(A) in

16   Paragraph 67 of the complaint, it indicates and that portion

17   of the code indicates what is required to be included in the

18   body of the e-mail, in other words, the content of the e-mail.

19   And one of those things is the physical address of the sender.

14:54:44 20   We allege in our complaint, frankly, there were no facts

21   submitted to contradict this, that the e-mail's either did not

22   contain a physical address or didn't contain a correct

23   physical address.  That's in the content portion of the

24   e-mail.  So for Mr. Newman to say that this case doesn't

14:54:57 25   involve the e-mail content is inaccurate.

1           Secondly, I don't believe, and I agree with Your

2      Honor.  I don't believe that I conceded general jurisdiction.

3      And I think what I said is I don't have the facts in front of

4      me today to make a general jurisdiction argument, which is the

14:55:14   5      basis for my request for discovery.

6           THE COURT:  So a sender is a defined term I think

7      under the CAN-SPAM Act.

8           MR CAMERON:  Correct.

9           THE COURT:  And is there an allegation in this

14:55:23   10      complaint that Fluent is an e-mail sender?

11           MR CAMERON:  Yes, Your Honor.  It's their product

12      service or website that are being promoted through the

13      e-mails.  The CAN-SPAM Act defines a sender as the party's

14      product, service or website.  It's promoted in the e-mails.

14:55:38   15      And in addition to that, when a private plaintiff like

16      XMission is suing there's a procurement element.  We've

17      alleged both, that Fluent is a procurer and it also is a

18      sender.  And we've alleged that the e-mails don't contain an

19      accurate physical address of the sender.  I'm unable to

14:55:56   20      identify a single e-mail that contains Fluent's address.

21           And in addition to that I don't believe the e-mails

22      contain accurate addresses.  And so we've alleged that, and

23      that certainly goes to the content of the e-mail that Fluent

24      admits it creates and provides.

14:57:04   25           (Time lapse.)

1          THE COURT:  Anything else, Mr. Cameron?

2          MR CAMERON:  No, Your Honor.

3          THE COURT:  All right.  Thank you.  We'll take a

4     brief recess, and I'll let you know if we can provide a ruling

14:57:30  5     today or if we'll take the matter under advisement.  We'll see

6     you in 10 minutes or so.  Thank you.

7          MR CAMERON:  Thank you, Your Honor.

8          (Recess.)

9          THE COURT:  We'll go back on the record in our

15:46:17 10     XMission case.  Usually when I say 10 minutes and then it

11     turns into 40 I come in the courtroom and the parties have all

12     settled the case.  I assume that's true here.

13          All right.  Thank you for indulging that extra

14     time.  I wanted to make sure I was being fair and thorough and

15:46:37 15     considering Fluent's arguments, and I wanted to more carefully

16     scrutinize some of the information that Mr. Cameron focused us

17     on today, and I wanted to spend a little more time considering

18     Fluent's request for jurisdictional discovery.

19          We're not going to reopen the case and allow

15:47:07 20     jurisdictional discovery.  I think the time for seeking that

21     has passed.  I'll speak for completely to that issue in a

22     moment.

23          And for the reasons I'm about to express, I find

24     the motion to dismiss to be well taken.  I'm going to grant

15:47:25 25     the motion to dismiss.  What I'm going to provide now is an

63

1    oral ruling that I hope is sufficiently detailed to describe

2    for all of you and any court that might review it what facts

3    I'm relying on and what standards I'm applying.  I'm not going

4    to ask any of you to go to the trouble of taking detailed

15:47:45   5    notes for the purpose of preparing and submitting a draft

6    ruling.  Instead we'll enter an order on the docket

7    referencing this portion of the transcript of the hearing as

8    the Court's ruling and the basis for the Court's ruling.  And

9    I'll just beg your indulgence.  This will take a little while.

15:48:05   10    So by way of introduction plaintiffs XMission is an

11    Internet service provider.  XMission sued Fluent and other

12    defendants here for alleged violation of a CAN-SPAM Act.

13    15 United States Code Sections 7701 through 7713.

14    In its complaint XMission alleges that each of the

15:48:35   15    defendants sent thousands of spam e-mails to XMission's

16    customers through XMission servers located here in Utah.  I'm

17    drawing that background from the complaint, which is Docket 2

18    on the Court's docket.

19    Defendant Fluent, LLC, now moves the Court to

15:48:55   20    dismiss XMission's claims against it for lack of personal

21    jurisdiction.  Fluent's motion to dismiss is Docket Number 22.

22    And for the reasons that follow, I am granting Fluent's

23    motion.

24    By way of factual background, Fluent provides

15:49:16   25    various Internet services including the hosting of e-mail

1      accounts.  XMission owns the servers, routers and switches

2      through which it provides those services.  XMission claims the

3      defendants each sent thousands of e-mails to its servers in

4      Utah and that the e-mails violated the CAN-SPAM Act in

15:49:36  5      different ways.  That's citing the complaint at Paragraphs 22

6      through 29.

7           Fluent is a Delaware limited liability company I

8      think operating in New York.  It works in digital marketing

9      and advertising.  And as part of its business Fluent contracts

15:49:54  10      with third-party publishers to distribute advertising content

11      via e-mail and other methods.  The e-mails contain links to

12      designated websites.  Fluent compensates the third-party

13      publishers when target consumers who receive the e-mails click

14      on these links.  I'm drawing here again from the complaint and

15:50:20  15      also from the motion to dismiss, and specifically the Barsky

16      declaration at Docket 23.  The motion to dismiss, Docket 22.

17           XMission alleges Fluent is responsible for sending

18      over 10,000 e-mails to XMission customers through XMission's

19      networks and network servers in violation of the CAN-SPAM Act,

15:50:46  20      Paragraph 28 of the complaint.

21           Specifically XMission alleges that 3,674 of the

22      e-mails from Fluent contained misleading header information,

23      that 5,117 e-mails originated from sender domains registered

24      with false information, and, quote-unquote, many e-mails

15:51:11  25      failed to include a physical address of the sender.  These

1    allegations are in Paragraphs 50, 64 and 69 of the complaint.

2         Because of those e-mails XMission contends it has

3    incurred various harms including financial and reputational

4    damages.  That's set forth in Paragraph 38 of the complaint.

15:51:35 5         Fluent as I've said moves to dismiss the claims

6    against it under Rule 12(b)(2) of the Federal Rules of Civil

7    Procedure arguing that this court lacks personal jurisdiction

8    over Fluent.  That motion to dismiss as I said is Docket

9    Number 22.  Fluent argues it lacks minimum contacts with Utah

15:51:55 10   and that the court's exercise of personal jurisdiction over it

11   would be unfair and unreasonable.

12        Turning first to the standards generally that

13   apply.  XMission as the plaintiff bears the burden to show

14   personal jurisdiction is proper over Fluent.  Quote, but

15:52:17 15  whereas here the issue is raised early on in litigation based

16   on pleadings and affidavits, that burden can be met by a prima

17   facie showing, end quote.  And I'm quoting, of course, from

18   Shrader, a 10th Circuit decision from 2011.

19        I'm told that I'm required to treat all well-plead

15:52:36 20  facts in the complaint as true to the extent that they are

21   uncontroverted by the defendant's affidavits.  And I'm

22   required to resolve any factual disputes in the plaintiff's

23   favor.  Those instructions again I would cite to Shrader.

24        In a federal question case like this one, the Court

15:52:54 25  must determine, first, whether the applicable statute

1    potentially confers personal jurisdiction by authorizing

2    nationwide service of process; and, second, whether the

3    exercise of jurisdiction comports with due process.  I'm

4    citing the Peay vs. BellSouth case from the 10th Circuit in

15:53:15  5    2000.

6         The CAN-SPAM Act does not authorize nationwide

7    service of process, so Utah law governs the issue of personal

8    jurisdiction in this case.  And I would cite to

9    Rule 4(i)(1)(A), which provides that personal jurisdiction

15:53:32  10   exists over a defendant who is subject to jurisdiction in the

11   state where the District Court is located.  And also I would

12   cite, it's not a companion case the Zoobuh, Inc., decision,

13   the Savicom decision from 2018 Judge Parrish following this

14   same framework.

15:53:52  15        Because Utah's long arm statute is coextensive with

16   the due process clause of the 14th Amendment, personal

17   jurisdiction over Fluent here boils down to a single due

18   process inquiry.  That's the language of Old Republic from the

19   10th Circuit in 2017.  There, of course, the court was

15:54:11  20   applying Colorado's long arm statute, but the analysis here is

21   the same given the language of the two statutes.

22        The due process clause of the 14th Amendment

23   constrains a state's authority to bind a nonresident defendant

24   to a judgment of its courts.  That's a quote from the Walden

15:54:33  25   decision from the Supreme Court in 2014.  And for that reason

1    we're told that to satisfy the due process clause at least in

2    the 10th Circuit under the Old Republic framework the Court

3    must ensure, number one, that the defendant purposefully

4    established minimum contacts with the forum state; and, number

15:54:51  5    two, that the assertion of personal jurisdiction would comport

6    with fair play and substantial justice.  Again, language from

7    Old Republic, 2017, 10th Circuit.

8              Depending on the nature of the defendant's contacts

9    of the forum state personal jurisdiction may be either general

15:55:09  10   or specific.  And since it's included in the papers I'll just

11   briefly touch on general jurisdiction.

12             General jurisdiction over Fluent exists only if

13   Fluent's, quote, affiliations with the state are so continuous

14   and systemic as to render it essentially at home, end quote,

15:55:28  15   and I'll say in Utah.  That's the Daimler decision from the

16   Supreme Court in 2014.  XMission in my view falls far short of

17   meeting that high standard.  And, in fact, rather than setting

18   out the legal standard that applies, rather, and rather than

19   explaining why Fluent's contacts with Utah render it

15:55:50  20   essentially at home, here XMission simply states that general

21   jurisdiction is proper and that its argument on this point is

22   subsumed in the specific jurisdiction analysis that is

23   entirely unsatisfying and unpersuasive.  That's Page 11 at

24   Docket 44.

15:56:09  25             Given this inadequate showing of XMission in its

68

1    papers the Court declines to exercise general jurisdiction

2    over Fluent.  And without conducting a full analysis, I will

3    also note that the record here provides no factual basis on

4    which I could make a conclusion that Fluent is essentially at

15:56:29  5    home in Utah.

6           So we'll turn to specific jurisdiction where most

7    of our argument focused today.  Unlike general jurisdiction,

8    specific jurisdiction exists over an out-of-state defendant

9    only for those claims related to the party's contacts with the

15:56:47 10    forum state.  That was instruction from Old Republic at

11    Page 904.

12           Whether the Court has specific jurisdiction

13    requires a two-step inquiry.  First, the plaintiff must show

14    that the defendant purposefully directed activities from the

15:57:05 15    forum state and that the plaintiff's claims arise out of those

16    minimum contacts.  And if the plaintiff makes that initial

17    showing, then the burden shifts to the defendant to present a

18    compelling case that the presence of some other considerations

19    would render jurisdiction unreasonable.  Now all of this is

15:57:25 20    drawn from that Old Republic decision.

21           The Supreme Court of course has emphasized in

22    recent years that in analyzing minimum contacts, quote, it is

23    the defendant, not the plaintiff or third parties, who must

24    create contacts with the forum state.  That's language from

15:57:42 25    the Walden decision in 2014.

1    So turning to the first consideration here,

2    XMission argues personal jurisdiction exists because Fluent

3    deliberately sent thousands of e-mails to Utah residence

4    through its XMission Utah servers.  The way I read the

15:58:02  5    argument, actually, I'm going to restate it I think more

6    precisely because Fluent caused those e-mails to be sent to

7    Utah and to the XMission servers in Utah.  I'm drawing this

8    from the opposition to the motion to dismiss, which is Docket

9    Number 44, and this is largely set out on Page 13.

15:58:24  10    Fluent argues -- I should say that Docket Number 44

11    was the amended opposition to the motion to dismiss.  But

12    that's what I'm referring to today throughout this discussion.

13    Fluent disagrees.  It argues it did not

14    purposefully direct any activity to Utah related to

15:58:51  15    plaintiff's claims because third-party publishers exclusively

16    and not Fluent sent the e-mails in question.  This is set out

17    at Pages 8 through 10 of the motion to dismiss, Docket 22.

18    As evidence of this Fluent presents the declaration

19    of Daniel J. Barsky as general counsel and chief compliance

15:59:16  20    officer, and I think he was introduced as vice-president

21    today.  His declaration is Docket Number 23.

22    In it Mr. Barsky attests under oath that all of the

23    e-mails sent in its marketing claim, quote, are sent by the

24    publishers, not by Fluent, end quote.  That's Paragraph 6 of

15:59:37  25    his declaration.  And he further declares, quote, Fluent also

1    has no involvement with or control over the origination,

2    approval or delivery of the e-mails.  It does not see the

3    e-mails before they are sent by the publishers, know where,

4    i.e., the location or the recipient, the publisher sending

15:59:58  5    e-mails or decide the customers to whom the publishers should

6    publish the e-mails, end quote.  Again, Paragraph 6 of

7    Barsky's declaration.  XMission does not present any evidence

8    to controvert Mr. Barsky's testimony.

9         I think to be clear I didn't read XMission's papers

16:00:20  10   to concede this point, but I will stress that XMission

11   presented no evidence to the contrary.  And further to this

12   point, it does not appear that XMission disputes that Fluent

13   relies exclusively on third-party publishers to send the

14   e-mails, at least those that are at issue in this case.

16:00:44  15        And I just I'll point out that in the 10th Circuit,

16   and I'll cite here to Pierce vs. Shorty Small's of Branson,

17   Inc., 1998 decision, the 10th Circuit explained that the

18   plaintiff cannot rest on the well-pled allegations of the

19   complaint once they are controverted by an affidavit or

16:01:10  20   declaration by a defendant.  And so this is why to the extent

21   that there is anything in the complaint that contradicts

22   Mr. Barsky's sworn testimony his testimony is controlling for

23   purposes of this motion today.

24        On the record before me, I cannot find any evidence

16:01:30  25   that Fluent took any actions purposely availing it of

71

1    jurisdiction in this case.  And in reaching that decision, I

2    will say that I draw heavily from Judge Stewart's 2014

3    decision in this district that had remarkably similar facts.

4    And that case also brought under the CAN-SPAM Act

16:01:53  5   Judge Stewart found no minimum contacts where the defendant

6    found third-party publishers to send marketing e-mails to

7    customers in Utah.  The parties here are all familiar with

8    that days, but it's <u>Zoobuh, Inc., vs. Williams</u>.  The Westlaw

9    citation 2014, Westlaw 7261786, District of Utah, December 18,

16:02:18  10   2014.

11           And the facts of that case just very briefly

12    involved the CEO of the defending company providing similar

13    testimony to that here that the company had, quote, no

14    involvement with or control over the origination, approval or

16:02:33  15   delivery of the e-mails, end quote.  That's at Page 5 of the

16    decision.

17           Based on that uncontroverted evidence,

18    Judge Stewart held that, quote, he could not find that the

19    defendant directly took any actions that are the subject of

16:02:47  20   this litigation, end quote.  Judge Stewart went on to note

21    that there is no evidence upon which the Court could find an

22    agency relationship between the defendant and the third-party

23    publishers.  That's also at Page 5 of the decision.

24           And the same reasoning applies here.  Fluent, at

16:03:05  25   least on the record before me today, there's no evidence that

1    Fluent took any direct actions that are the subject of this

2    litigation.  And there's no evidence in the record from which

3    I could find an agency relationship.  And it's important to

4    stress XMission does not explicitly argue agency or plead

16:03:24    5    agency in its complaint.  XMission does appear in its papers

6    to argue control or direction over the third-party publishers

7    but doesn't invoke agency which, of course, would enable us to

8    engage in a detailed legal analysis to determine whether there

9    was any agency agreement and what the scope of that agreement

16:03:47   10    was.  And, in fact, instead the evidence before the Court is

11    that there was a contractual relationship between Fluent and

12    the third-party distributors, no evidence that either Fluent

13    or the third-party distributors intended or believed they were

14    going to turn into an agency relationship, and there is no

16:04:05   15    evidence of that before us.

16        On the contrary, Fluent's uncontroverted evidence

17    establishes that the third-party publishers maintained full

18    control over distribution of the e-mails including to whom

19    those e-mails were sent and when.

16:04:22   20        Turning to other jurisdictional arguments advanced

21    by XMission, XMission appears not to dispute that Fluent used

22    third-party publishers as I've said to send the e-mails at

23    issue.  Instead it seems to be arguing that specific

24    jurisdiction exists due to XMission's involvement with the

16:04:43   25    e-mails in question.  The 10th Circuit has found purposeful

1    direction for specific jurisdiction purposes under at least

2    three separates analytical frameworks.  And I'll draw again on

3    the Old Republic decision.  I think it's the most helpful and

4    very recent case.

16:05:01  5           The 10th Circuit finds purposeful direction, first,

6    based on the defendant's continuing relationship with forum

7    state residence; or, second, where the defendant deliberately

8    exploits the forum state market; or, third, where the

9    defendant's conduct has substantial harmful effects in the

16:05:20  10   forum state.  The discussion begins at Page 895 of the

11   Old Republic decision.

12           XMission argues personal jurisdiction over Fluent

13   here under the second and third of those three frameworks

14   described by the 10th Circuit, and also under a stream of

16:05:36  15   commerce analysis.  But for the reasons I'll explain now I

16   find none of those arguments persuasive.

17           Turning first to market exploitation.  XMission

18   fails to show purposeful direction under the market

19   exploitation framework.  Old Republic explained the continuous

16:05:54  20   and deliberate exploitation of the forum state market can in

21   some circumstances provide a basis for minimum contacts.  And

22   the 10th Circuit provided further direction about how to

23   evaluate that.  Quote, factors suggesting purposeful direction

24   based on forum state market exploitation includes, A, high

16:06:17  25   sales volume and large customer base and revenues; and, B,

1    extensive nationwide advertising or ads targeting the forum

2    state.

3              The record here show Fluent did not send the

4    e-mails, control any aspect of their distribution or know

5    where the publishers sent them.  And on that record, I

6    conclude that Fluent took no actions to deliberately exploit

7    the Utah market, but I'll say more about the Old Republic

8    factors and specifically focus on national advertising and

9    revenues.

10             XMission has not shown Fluent has extensive Utah

11   sales or revenues, nor the type of extensive nationwide

12   advertising or targeting ads which would suggest purposeful

13   direction.  And I would cite to Old Republic at Pages 914

14   through 916 where the 10th Circuit found no market

15   exploitation where the defendant engaged in nationwide

16   marketing efforts through its website but did not have

17   nationwide television ads, sports or celebrity sponsorships,

18   physical ads in Colorado or ads targeting Colorado residents.

19             And in its supplemental brief XMission argues

20   Fluent's revenue from Utah despite being only .9 percent of

21   its total revenue supports the exercise of jurisdiction

22   because it amounts to an estimated, I'm going to round up, to

23   $3 million in the last three years.

24             Zoobuh vs. Savicom Judge Parrish reasons that

25   significant revenues derived from Utah even if a small

1    percentage of a company's total revenues might support the

2    exercise of personal jurisdiction.  This is Page 8 of her

3    written decision, 2018 WestLaw 2768665.  But Judge Parrish

4    raised that issue in the reasonableness analysis under the

16:08:14  5    14th Amendment after finding it undisputed that the defendant

6    in that case used Mineshare's e-mail platform to send e-mails

7    to e-mail addresses that were associated with a specific

8    customer list and specifically involving Utah residents.  The

9    fact that Fluent's .9 percent of revenues may represent a

16:08:37  10   significant dollar amount may suggest the exercise of

11   jurisdiction would not be unreasonable, but the unreasonable

12   analysis is distinct from the court's initial threshold burden

13   which is that of determining whether XMission deliberately

14   exploited Utah market thereby demonstrating purposeful

16:08:57  15   direction.  XMission must show Fluent deliberately exploited

16   Utah's market, and this they've not done, nor have they

17   shown -- when I say "they" I mean XMission.  Neither has

18   XMission shown in its submissions that any of that revenue is

19   connected in any way to Fluent's conduct which forms the basis

16:09:20  20   for the allegations in the complaint and the claims that are

21   asserted in this case.  In fact, as Mr. Cameron candidly

22   acknowledged in argument nobody knows the source of those

23   revenues from Utah for Fluent, at least not on the record

24   before us.

16:09:35  25          Turning to harmful effects, I conclude that

1   XMission -- neither has XMission adequately shown purposeful

2   direction under the Calder harmful effects framework.

3   Purposeful direction is established where the defendant

4   engages in, A, an intentional action that was, B, expressly

16:10:00   5   aimed at the forum state with, C, knowledge that the brunt of

6   the injury would be felt in the forum state.  I'm paraphrasing

7   there, but that's language from Page 907 of the Old Republic

8   decision.

9         As an initial matter it is not at all clear to me

16:10:18   10   at least that the harmful effects framework applies outside of

11   the context of defamation.  And for reference I would cite

12   Note 34 of the Old Republic decision where the 10th Circuit

13   stated that the Supreme Court has recently suggested that the

14   Calder effects test does not extend beyond the defamation

16:10:38   15   context.  And there the 10th Circuit was cited to Walden.

16         To the extent the Calder framework does remain

17   applicable the 10th Circuit has explained that when analyzing

18   Internet contacts courts should look to indications that a

19   defendant deliberately directed its message at an audience in

16:10:57   20   the forum state and intended harm to the plaintiff occurring

21   primarily or particularly in the forum state.  That's language

22   from Shrader at Page 1241, 10th Circuit, 2011.

23         Here the record before me shows that Fluent did not

24   control the distribution of the e-mails or know where the

16:11:17   25   publisher sent them.  Even if XMission could show the

1    publishers directed e-mails at consumers in Utah, quote,

2    primarily or particularly, end quote, XMission provides the

3    Court with no basis to impute those contacts to Fluent.

4           A couple side notes about that.  XMission argues

16:11:38   5    purposeful direction is met because XMission's domains are

6    publicly registered in the WHOIS database as located in Utah

7    and because some of the e-mail addresses contain the word

8    Utah.  But without any evidence that Fluent provided,

9    controlled, approved or even had knowledge of the e-mail

16:11:57  10    addresses these facts tell us nothing about Fluent's

11    purposeful direction.

12           And further, in a supplemental -- or rather in a

13    notice of supplemental authority, which is Docket Number 75,

14    XMission raises a case from the Ninth Circuit in which the

16:12:15  15    court there found a company expressly aimed its conduct at

16    California.  That's the Mavrix photo case, Ninth Circuit,

17    2011.

18           But the company's website there contained

19    third-party advertisements specifically targeting California

16:12:32  20    residents, and the Court found that to be the evidence that

21    the company was deliberately exploiting its California

22    customer base by selling space on the website to those

23    advertisers.  Besides the fact that that case is not binding

24    in this circuit or on me it's also the case in my judgment

16:12:49  25    that the facts are so different there that it's not

1    particularly helpful in application here.

2            Finally, turning to XMission's stream of commerce

3    theory, again I find that XMission fails to establish that

4    personal jurisdiction exists under its stream of commerce

5    theory.  A corporation purposefully avails itself of

6    jurisdiction if it, quote, delivers its products into the

7    stream of commerce with the expectation that they will be

8    purchased by consumers in the forum state, end quote.  That's

9    familiar language to all of us who went to law school after

10   1980.  It's the World-Wide Volkswagen case.

11           XMission argues Fluent's advertising content and

12   data gathering website are its, quote-unquote, products, and

13   that Fluent delivered those products into the stream of

14   commerce when it sent advertising content to the third-party

15   publishers with the expectation that those e-mails would be

16   distributed to consumers.

17           As a threshold matter, let me state that I have

18   considerable skepticism about whether the World-Wide

19   Volkswagen framework which I think is borne of product

20   liability theories and products sales has any application to

21   the distribution of data or information in the modern age.

22   And I'll just observe that during oral argument Mr. Cameron

23   could identify no case that he was aware of applying

24   World-Wide Volkswagen to an e-mail case, for example, and I'm

25   not aware of one.

1           But even assuming the World-Wide Volkswagen

2     rationale is still alive in light of recent jurisdictional

3     cases from the Supreme Court and assuming that it applies in

4     an electronic context and would govern e-mails as products, to

16:14:46  5     the extent XMission argues the advertising content is Fluent's

6     product that's insufficient to serve as the basis for minimum

7     contacts because XMission's claims arise from the alleged

8     violations in the structure of the e-mails and in the data of

9     the e-mails and in the headers of the e-mails not in the

16:15:05 10     advertising content itself contained in the e-mails.  In other

11     words, this is true of all of their claims except the third

12     claim, which I'll address in a moment.

13           In other words, XMission does not claim the content

14     itself is misleading, rather its claims primarily center

16:15:22 15     around allegedly misleading header information, falsely

16     registered sender domains and failure to include the sender's

17     physical address in the e-mails.  Even if Fluent delivered the

18     advertising contents to the publishers, it did not deliver the

19     e-mails themselves.

16:15:37 20           And with respect to the physical address

21     information e-mails, I'll just observe even if I construe that

22     to be content of an e-mail under the CAN-SPAM Act, and I don't

23     know because it wasn't briefed, but let's assume that that's

24     true, in order to evaluate whether Fluent bears any

16:16:03 25     responsibility for under a World-Wide Volkswagen stream of

1    commerce product theory relating to the content of the e-mails

2    we'd have to know more than we know about the contractual

3    relationship between Fluent and the third-party distributors

4    and who was responsible for ensuring that that information was

16:16:21    5    included in any e-mails that were distributed.

6           For example, there is no fact, there's no pleading,

7    there's no evidence before the Court that Fluent was aware

8    that any of these e-mails lacked that information or that the

9    information provided was incorrect in any of the e-mails that

16:16:39   10    were sent that are the subject of this lawsuit.  There is no

11    evidence that it was Fluent's responsibility under its

12    contractual relationship of its third-party distributors to

13    provide that information.  There's just no -- there's only

14    room for speculation because the record is silent on this

16:16:54   15    point.

16           And similarly, if Fluent's data gathering websites

17    linked in the e-mails are considered Fluent's product Fluent's

18    actions in providing those links to the third-party publishers

19    cannot itself serve as minimum contacts in this case because

16:17:10   20    XMission's claims don't arise from the links or those related

21    websites.

22           Because XMission fails to provide evidence of

23    minimum contacts between Fluent and the forum state the Court

24    need not determine whether the exercise of jurisdiction would

16:17:26   25    otherwise comport with traditional notions of fair play and

1    substantial justice.  Before I give my brief conclusion --

2    well, let's do it the other way.

3            For those reasons given Fluent's uncontroverted

4    affidavit establishing that it does not send or exercise

16:17:46  5    control over the e-mails which serve as the basis for

6    XMission's claims I find that the Court lacks a basis to

7    exercise personal jurisdiction over Fluent in this case.  And

8    for those reasons Fluent's motion to dismiss, Docket

9    Number 22, is granted.

16:18:02 10            And I should address what I've construed to be an

11    oral motion by XMission's counsel in court today to allow

12    limited jurisdictional discovery.

13            I missed one other thing I meant to say.  I

14    apologize.  Just for the completeness of the record in case

16:18:32 15    it's helpful to all of you I was going to make one more

16    observation about the Calder effects test, and I'll add that

17    now.  I didn't touch on, but Mr. Cameron argued today, he

18    advanced in argument today that I construed to result to the

19    third prong of Calder effects framework which relates to

16:18:57 20    whether Fluent had knowledge that the brunt of the injury

21    would be felt in the forum state.  And the argument that I

22    think I understood Mr. Cameron made was that Fluent knows that

23    it's injuring Utah residents because it had sent these e-mails

24    to Utah residents who have clicked on those links who have

16:19:20 25    provided their address information and who have formed

1    contractual relationships with Fluent as a result.  And I will

2    say that I again examined the record, and there's no evidence

3    of any that in the record.  The evidence before me is limited

4    to the distribution, the allegation of the distribution of

16:19:43  5    roughly 10,000 e-mails to Utah residents.  There is no fact,

6    evidence or allegation in the pleading that any Utah resident

7    clicked on any links, made contact with Fluent, formed a

8    contractual relationship or was otherwise injured.  And on

9    that basis, I think there's no fact on which I can conclude

16:20:06  10    that Fluent has knowledge that it was harming citizens in this

11    state, that the brunt of any injury would be felt in the

12    forum.

13         Turning back to XMission's oral motion as I

14    construe it today for discovery, jurisdictional discovery, I'm

16:20:26  15    denying that motion to the extent that it is a motion

16    primarily on the basis that it's untimely.  It was XMission's

17    view after receiving the motion to dismiss and

18    Mr. Barsky's declaration that XMission needed additional

19    evidence before it could fully respond and it was incumbent on

16:20:51  20    XMission to seek leave of the Court to conduct that discovery.

21    Instead it sat on its hand silently and instead filed a

22    response to the declaration and then advanced legal arguments.

23    It's neither fair nor appropriate to wait until after we

24    arrive at oral argument and the Court expresses the skepticism

16:21:22  25    about arguments advanced by a party to assume a fallback

1    position asking for relief that's not sought in a motion.  It

2    wasn't timely sought and the like.  An analogy in my mind

3    would be arriving at a hearing on a motion for summary

4    judgment and discovering that the Court thought there were

16:21:43  5    facts in dispute or not in dispute and then asking for leave

6    to go back and take further discovery to find more facts.

7            That's not fair to the party who, in this instance

8    Fluent who relied on XMission's response in preparing a reply

9    and preparing for argument today and coming here.  And I can't

16:22:03  10    see -- I respectfully disagree with Mr. Cameron about the

11    potential consequences of granting jurisdictional discovery at

12    this time.  I think the effect of that would be to start over

13    on jurisdiction because I think Fluent would have to craft a

14    new motion to dismiss in view of whatever facts were

16:22:22  15    developed.  And then we'd have a different opposition.  We'd

16    be relying ostensibly on different facts and maybe even

17    different legal theories.  It would just be a redo, and it's

18    too prejudicial in my judgment to do that to Fluent at this

19    point of the proceeding.  So that motion is denied.  The

16:22:47  20    motion is granted.  The claims against Fluent are dismissed.

21            Notwithstanding any disagreement you have with that

22    ruling or the basis for the ruling, do either of you have any

23    questions or is there anything more we should take up?

24    Mr. Cameron?

16:23:02  25            MR CAMERON:  No, Your Honor.  But thank you for the

84

1    thorough analysis.

2           THE COURT:  That's kind of you.  Thank you.  It's

3    not helpful to you or your client, I understand, but I try to

4    be complete so you can make whatever use you need of the

16:23:14  5    ruling.

6           Mr. Newman, anything from Fluent?

7           MR. NEWMAN:  No, Your Honor.  Thank you.

8           THE COURT:  Thanks to all of you for your argument

9    and your briefing.  We'll be in recess.

16:23:23  10        (Whereupon, the court proceedings were concluded.)

11                        *   *   *   *   *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  STATE OF UTAH          )

2                         ) ss.

3  COUNTY OF SALT LAKE  )

4          I, KELLY BROWN HICKEN, do hereby certify that I am

5  a certified court reporter for the State of Utah;

6          That as such reporter, I attended the hearing of

7  the foregoing matter on August 30, 2018, and thereat reported

8  in Stenotype all of the testimony and proceedings had, and

9  caused said notes to be transcribed into typewriting; and the

10  foregoing pages number from 3 through 85 constitute a full,

11  true and correct report of the same.

12          That I am not of kin to any of the parties and have

13  no interest in the outcome of the matter;

14          And hereby set my hand and seal, this ____ day of

15  _____ 2018.

16

17

18

19

20          _____

21                      KELLY BROWN HICKEN, CSR, RPR, RMR

22

23

24

25